Daniel J. LEVITAN and Vincent L. Leonardo, Appellants,

v.

John D. ASHCROFT, Attorney General, et al., Appellees.

**1314**

No. 00-5346.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 2002.
Decided March 8, 2002.

Michael J. Golden, appointed by the court, argued the cause as amicus curiae on the side of appellants. With him on the briefs was Richard P. Bress.

G. Michael Harvey, Assistant United States Attorney, argued the cause for appellees. With him on the brief were Roscoe C. Howard Jr., United States Attorney, and R. Craig Lawrence, Assistant United States Attorney. David T. Smorodin, Assistant United States Attorney, entered an appearance.

Before: EDWARDS, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Appellants are federal prisoners who are practicing Catholic Christians. They challenge a prison rule preventing them from consuming small amounts of wine as part of the Catholic sacrament known as Communion. In the past, prison officials have allowed inmates to consume wine under supervision during Communion. Under the new rule, however, only the supervising chaplain is permitted to consume the wine. Appellants claim that this prohibition violates their constitutional rights under the free exercise clause of the First Amendment.

■ A prison regulation that impinges on inmates' constitutional rights is valid if it is reasonably related to legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). In this case, the District Court granted summary judgment for the prison officials on the ground that consuming wine during Communion is not an essential· aspect of appellants' religious practice, one "which the believer may not violate at peril of his soul." *Levi-*

*tan v. Reno*, Civ. Action No. 99-0017, Mem. Op. at 8 (D.D.C. Aug. 3, 2000) ("Mem. Op.") (quoting *Ward v. Walsh*, 1 F.3d 873, 878 (9th Cir.1993)), *reprinted in* Joint Appendix ("J.A.") 22. In reaching this result, the District Court erred in holding that, to qualify for protection under the First Amendment, a religious practice must be *mandated* by the prisoners' religion. This holding finds no support in our case law. The District Court also failed to perform the balancing analysis required by *Turner* and *O'Lone*.

We therefore reverse and remand the case to the District Court for further proceedings.

## I. BACKGROUND

Appellants are incarcerated at the Federal Prison Camp in Pensacola, Florida ("the prison"). They are self-described Catholic Christians who were baptized as children. *See* Decl. of Daniel J. Levitan ("Levitan Decl.") ¶ 1, *reprinted in* J.A. 69; Decl. of Vincent Leonardo ("Leonardo Decl.") ¶ 1, *reprinted in* J.A. 75. As part of their religion, they practice the Eucharist sacrament, which is also called Holy Communion. Levitan Decl. ¶ 7, *reprinted in* J.A. 70; Leonardo Decl. ¶ 4, *reprinted in* J.A. 76. Communion is traditionally administered by a priest. After the priest consecrates bread and wine (sometimes called "species" or "forms"), appellants believe that the bread transforms into the body of Jesus Christ, their Messiah and Lord, and that the wine transforms into his blood. This transformation is called transubstantiation. Am. Compl. for Declaratory J. and Temporary and Permanent Injunctive Relief ("Am. Compl.") ¶ 28, *reprinted in* J.A. 31.

According to appellants' long-standing practice, after the consecration, the priest, as well as the congregants, consume the transubstantiated bread and wine. Levi-

tan Decl. ¶ 7, *reprinted in* J.A. 70; Leonardo Decl. ¶ 4, *reprinted in* J.A. 76; Am. Compl. ¶ 28, *reprinted in* J.A. 31. The priest can present the wine using several methods, including the chalice (congregants sip directly from a cup the priest holds), the spoon (congregants use a spoon to sip from a cup the priest holds), the straw (congregants sip through a straw from a cup the priest holds), and intinction (congregants dip the transubstantiated bread into the wine and then eat the bread). *See* Br. of *Amicus Curiae* on Behalf of Appellants ("Br. of Appellants") at 5 n.7. In their complaint, appellants stated their belief that it was "the command of the Lord Jesus Christ to consume both bread and wine" during the Eucharist sacrament. Am. Compl. ¶ 33, *reprinted in* J.A. 32. They further stated that the liturgical life of their church "revolves around" the Eucharist ritual. *Id.* ¶ 31.

Federal law has long prohibited prisoners from consuming alcohol. *See* 18 U.S.C. § 1791 (2000) (setting forth punishments for possessing contraband, including alcohol, in prison); 28 C.F.R. § 541.13 (2000) (making possession and use of alcohol in federal prisons sanctionable). Until recently, however, prison officials have permitted the chaplain to administer small amounts of wine to Catholic inmates during Communion, through intinction, with precautions. Levitan Decl. ¶¶ 3-4, *reprinted in* J.A. 69-70; Leonardo Decl. ¶ 3, *reprinted in* J.A. 75-76; Am. Compl. ¶ 3, *reprinted in* J.A. 24. In 1997, however, the United States Department of Justice, Bureau of Prisons ("BOP") issued Program Statement Number 5360.07, relating to "Religious Beliefs and Practices." BOP Program Statement No. 5360.07 (Aug. 25, 1997), *reprinted in* J.A. 44. Paragraph 19 deals with sacramental wine. It provides in relevant part:

> Sacramental wine is necessary for the worship of some faith groups, i.e., the requirements of the ritual cannot be sat-

isfied without the use of wine. In those cases only, the staff or contract chaplain may consume small amounts of wine for performance of the ritual.

*Id.* ¶ 19, *reprinted in* J.A. 45. There is no provision in the rule allowing prisoners to consume wine under any circumstances. Since the policy was implemented in mid-1998, appellants have been prevented from consuming wine during Communion. Instead, the prison chaplain consumes the wine himself, while the inmates consume only the bread. Levitan Decl. ¶¶ 4-6, *reprinted in* J.A. 70; Leonardo Decl. ¶ 3, *reprinted in* J.A. 76.

Appellant Daniel Levitan, acting *pro se,* brought suit against the Attorney General and the Director of the BOP (collectively, "the Government"), alleging that the Program Statement violated his First and Fifth Amendment rights. He subsequently amended his complaint to add additional plaintiffs, all of whom were then inmates at the prison. Appellants did not allege violations of the Religious Freedom Restoration Act (RFRA) as amended, 42 U.S.C.A. § 2000bb-1 *et seq.* (1994 & Supp. 2001). They have indicated, however, that they will seek to amend their complaint to add allegations under RFRA if the case is remanded. Br. of Appellants at 19 n.14.

Appellees moved for summary judgment before the District Court. In support of their motion, appellees submitted the declaration of Susan VanBaalen, a Catholic nun with degrees in divinity and theology, who was employed by the BOP. Decl. of Susan VanBaalen ("VanBaalen Decl."), *reprinted in* J.A. 50-52. In her declaration, Sister VanBaalen contended that the Catholic religion does not require congregants to consume the wine during Communion. Rather, Sister VanBaalen asserted that those who receive Communion under the form of bread alone "are not deprived of any grace necessary for salvation," *id.* ¶ 3,

*reprinted in* J.A. 51, and that consuming the bread alone is rooted in a long tradition that the Church recognizes as one of the ways in which Communion may be received, *id.* ¶ 5. Sister VanBaalen also stated that Communion "has a more complete form *as a sign* when it is received under the forms of both bread and wine." *Id.* ¶ 4. Appellees also obtained a letter to the same effect from the Roman Catholic Bishop of the Diocese in which the prison is located. Letter from Most Reverend John H. Ricard, S.S.J. to Sister Susan VanBaalen (Aug. 3, 1999), *reprinted in* J.A. 60-61. The Bishop noted that a number of Catholic parishes in his Diocese offer parishioners Communion without wine for the congregants. *Id.*

The District Court granted appellees' motion for summary judgment. *See Levitan v. Reno,* Civ. Action No. 99-0017 (Judgment) (D.D.C. Aug. 3, 2000), *reprinted in* J.A. 14. In its accompanying memorandum opinion, the District Court acknowledged that "correctional institutions may be required to accommodate the religious beliefs and practices of inmates," because prisoners retain the right to freedom of religion. Mem. Op. at 5, *reprinted in* J.A. 19. The District Court recited the established test that a prisoner's right to observe his religion in prison may be circumscribed when the infringement is reasonably related to a legitimate penological interest. *Id.* (citing *O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404). The court also listed the factors used to determine the reasonableness of restrictions on prisoners' rights as set forth in *Turner,* 482 U.S. at 89-90, 107 S.Ct. at 2261–62. *Id.* It noted that the prison officials had not provided any justification for the changed policy regarding inmates' consumption of wine during Communion. *Id.* at 6, *reprinted in* J.A. 20. The court declined, however, to apply the *Turner* factors or to make the *O'Lone* determination.

The District Court instead determined, relying on Sister VanBaalen's declaration, that appellants had not claimed that they were deprived of "a vital part of their religion." *Id.* at 8, *reprinted in* J.A. 22. The court distinguished between "a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul." *Id.* (quoting *Walsh,* 1 F.3d at 878). The court finally found that appellants had failed to show that the BOP rule prevented them from participating in "an essential aspect of their faiths' religious practice." *Id.* Appellants appealed. A panel of this court appointed *amicus curiae* to argue on appellants' behalf. *See Levitan v. Ashcroft,* No.00-5346 (Order) (Apr. 13, 2001).

## II. DISCUSSION

We review the District Court's grant of summary judgment *de novo.* *Summers v. Dep't of Justice,* 140 F.3d 1077, 1078 (D.C.Cir.1998). A court grants summary judgment only when there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must resolve doubts and make all reasonable inferences in favor of the opposing party. *Abraham v. Graphic Arts Int'l Union,* 660 F.2d 811, 814-15 (D.C.Cir. 1981).

### A. The Constitutional Framework

It is well established that prisoners retain constitutional rights in prison, including free exercise rights under the First Amendment. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974); *Cruz v. Beto,* 405 U.S. 319, 322 & n. 2, 92 S.Ct. 1079, 1081–82 & n. 2, 31 L.Ed.2d 263 (1972). The Supreme Court has held that "convicted prisoners do not forfeit all constitutional protections by reason of their

conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (citations omitted). Yet, lawful incarceration "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

In *Turner,* the Supreme Court set forth the standard for adjudicating prisoners' constitutional claims. It held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. at 2261. The Court set forth four factors relevant to this determination. First, there must be a valid, rational connection between the regulation and the legitimate interest put forth to justify it. *Id.* Second, there must be a determination whether the prisoners retain alternative means of exercising their asserted rights. *Id.* at 90, 107 S.Ct. at 2262. Third, there must be an assessment of the impact accommodation of the asserted constitutional right will have on guards, other inmates, and prison resources. *Id.* Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* The *Turner* Court applied these factors to uphold a regulation barring correspondence between inmates, while striking down a regulation prohibiting inmate marriages. *Id.* at 91-99, 107 S.Ct. at 2262-67.

A week after deciding *Turner,* the Court decided *O'Lone,* in which it applied *Turner* to prisoners' free exercise claims. 482 U.S. at 350-53, 107 S.Ct. at 2405-07. The Court conducted the requisite fact-intensive analysis and concluded that a prison rule preventing prisoners from attending a Muslim prayer service when they were working outside was adequately supported by specific concerns of prison administration. *Id.* In reaching this result, the Court in *O'Lone* did not doubt that the disputed rule impinged on the prisoners' constitutional rights. *Id.* at 349-52, 107 S.Ct. at 2404-06. Rather, the Court held that "the regulations alleged to infringe constitutional rights were reasonably related to legitimate penological objectives." *Id.* at 353, 107 S.Ct. at 2407.

In this case, the parties agree that the free exercise rights of prisoners are governed by the Supreme Court's analysis in *Turner* and *O'Lone.* In particular, the Government does not argue that the Supreme Court's holding in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), alters the *Turner* and *O'Lone* analysis in cases concerning infringements on prisoners' constitutional rights to practice their religions. In *Smith,* the Supreme Court held that the free exercise clause did not exempt religious individuals from complying with valid, neutral laws of general applicability, even if those laws arguably impinged on their religious practices. 494 U.S. at 878-79, 110 S.Ct. at 1599-1600. Many courts have grappled with the question of how the Court's decision in *Smith* interacts with the prisoner-specific test set forth in *Turner* and *O'Lone.* One possibility is that *Smith* supplanted the *Turner* analysis, because *Smith* can be read to say that religious inmates should never be entitled to exemptions from generally applicable, religion-neutral prison regulations. Another possibility is that *Smith* simply has no application in the unique and highly regulated prison context, so *Turner* and *O'Lone* continue to govern. A third possibility is that both *Smith* and *O'Lone/Turner* are applicable, but at different stages of analysis. Under this view, *Smith* is relevant in determining the scope of a person's free exercise right in the first

instance, while *Turner* and *O'Lone* are employed in determining how that right may be circumscribed in the specialized prison context. Thus, a prisoner asserting a right to smoke marijuana for religious purposes in prison would never reach the *Turner* analysis, because he would lack a First Amendment right under *Smith* to smoke marijuana in the first instance, whether in prison or elsewhere.

Most Courts of Appeals have taken the second approach, simply continuing to apply *Turner* and *O'Lone* in analyzing prisoners' constitutional rights. *See, e.g., Kikumura v. Hurley,* 242 F.3d 950, 956-58 (10th Cir.2001) (applying *Turner* factors to prisoner's free exercise claim); *Flagner v. Wilkinson,* 241 F.3d 475, 481-87 (6th Cir. 2001) (applying *Turner* to a prison grooming regulation and declining to apply *Smith*); *Green v. Polunsky,* 229 F.3d 486, 489-91 (5th Cir.2000) (applying *Turner* and *O'Lone* to prisoner's free exercise claim); *DeHart v. Horn,* 227 F.3d 47, 51-60 (3d Cir.2000) (*en banc*) (applying *Turner* factors to prisoner's religious right to have special diet in prison); *Hakim v. Hicks,* 223 F.3d 1244, 1247-49 & n. 3 (11th Cir. 2000) (applying *Turner* and *O'Lone* and noting that because the government had not argued that *Smith* required a different standard, the court would not decide the issue); *Walsh,* 1 F.3d at 876-77 (declining to depart from *Turner* and distinguishing *Smith*); *Salaam v. Lockhart,* 905 F.2d 1168, 1171 n. 7 (8th Cir.1990) (holding that *Smith* does not affect the *Turner/O'Lone* analysis); *see also Sasnett v. Litscher,* 197 F.3d 290, 292 (7th Cir.1999) (noting in *dicta* that *Smith* was not a prison case and it "did not purport to overrule or limit *Turner* and *O'Lone*; and the Supreme Court has instructed us to leave the overruling of its decisions to it"). *But see Hines v. S.C. Dep't of Corr.,* 148 F.3d 353 (4th Cir.1998) (upholding a prison grooming regulation under both *Smith* and *O'Lone*).

In this case, the Government does not contend that *Smith* alters the *Turner/O'Lone* analysis of prisoners' free exercise claims. Accordingly, we will apply the *Turner/O'Lone* legal framework to appellants' claims.

**B. Impingement is Not Determined by Whether the Religious Practice is "Mandatory"**

The District Court correctly identified *O'Lone* and *Turner* as the framework for analyzing rules that impinged on prisoners' constitutional rights. It found, however, that the BOP rule did not impinge on appellants' constitutional rights in the first place, because it did not prohibit them from participating in a *mandatory* religious practice. Or, as the District Court put it, appellants' constitutional rights were not infringed because a Catholic is not *required* to take wine at Communion "at peril of his soul." The District Court erred in this holding.

A requirement that a religious practice be mandatory to warrant First Amendment protection finds no support in the cases of the Supreme Court or of this court. Insofar as appellees suggest that this court articulated such a requirement in *Henderson v. Kennedy,* 253 F.3d 12, *reh'g denied,* 265 F.3d 1072 (D.C.Cir.2001), *petition for cert. filed sub nom. Henderson v. Stanton,* 70 U.S.L.W. 3445 (U.S. Jan. 2, 2002) (No. 01-978), they misread that case. In *Henderson* we held that a rule banning the sale of t-shirts on the National Mall did not substantially burden the religious practices of evangelical Christians who believed that they were obliged to preach the gospel by all available means. *Henderson,* 253 F.3d at 16; *see also Henderson,* 265 F.3d at 1074 (denying petition for rehearing). We noted that the plaintiffs in *Henderson* could not claim that the regulation "forces them to engage in conduct

that their religion forbids or that it prevents them from engaging in conduct their religion requires." *Henderson*, 253 F.3d at 16. *Henderson* does not suggest, however, that the plaintiffs had to make such a showing in order to demonstrate an impingement on their religious exercise.

The fact that a regulation affects a mandatory religious practice is, obviously, relevant evidence of an infringement on the free exercise of religion. But that is far from the only circumstance in which a rule impinges on free exercise. In *Henderson*, we mentioned "required" religious conduct in the context of a list of many scenarios that might have suggested that the ban on t-shirts substantially burdened the plaintiffs' religious freedom. *Id.* at 16-17. We noted that the plaintiffs had not attempted to sell t-shirts everywhere people congregate; that the regulation did not constrain conduct that manifested some central tenet of their beliefs; and that the plaintiffs had not treated selling t-shirts on the Mall as rising to a high level of significance in their religion. *Id.* In short, the court did not hold that, in order to demonstrate that a Government rule impinges on the free exercise of religion, a plaintiff must first show that the rule is directed at a practice deemed by the religion's believers to be "mandatory." This is not the law.

Nor would such a requirement make sense. Under the District Court's formulation, religions that lack the concepts of commandments necessary for the salvation of the soul would find themselves outside the scope of First Amendment protection altogether. Nothing in the free exercise clause suggests that it only protects religions that incorporate mandatory tenets.

Many cherished religious practices are performed devoutly by adherents who nonetheless do not or cannot insist that those practices are mandated. Neither the Supreme Court nor this court has ever adopted a rule limiting protection to prac-

tices that are compelled by a litigant's religion. We decline to adopt such a rule today.

## C. The Impingement Threshold

■ The fact that the First Amendment does not protect only compelled religious conduct does not mean that the Constitution forbids all constraints on religiously motivated conduct, however trivial. Instead, the First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice.

Our cases make clear that this threshold showing must be made before the First Amendment is implicated. *See Branch Ministries v. Rossotti*, 211 F.3d 137, 142 (D.C.Cir.2000) (holding that, to sustain its claim under either the Constitution or RFRA, a plaintiff must first establish that its free exercise right has been substantially burdened). This requirement accords with the Supreme Court's discussion in *O'Lone*, which assumed the importance of the relevant ritual to the prisoners. *See* 482 U.S. at 351, 107 S.Ct. at 2405–06.

■ In determining whether a litigant has met the threshold requirement, a court must consider several factors. The litigant's beliefs must be sincere and the practices at issue must be of a religious nature. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2225–26, 124 L.Ed.2d 472 (1993). The challenged rule must also burden a central tenet or important practice of the litigant's religion.

We are mindful of the Supreme Court's warning that judging the centrality of different religious practices is akin to "the unacceptable 'business of evaluating the relative merits of differing religious claims.'" *Smith*, 494 U.S. at 887, 110 S.Ct. at 1604 (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 2, 102 S.Ct. 1051,

1058 n. 2, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)); *see also Univ. of Great Falls v. NLRB*, 278 F.3d 1335 (D.C.Cir.2002) (same). Nonetheless, it is sometimes the case that litigants can make no credible showing that the affected practice is either central or important in their religious scheme. *See Henderson*, 253 F.3d at 17. In such cases, the *de minimis* burden imposed by the challenged law is not constitutionally cognizable. *Id.* In other cases, in which the practice at issue is indisputably an important component of the litigants' religious scheme, *see, e.g., City of Hialeah*, 508 U.S. at 531, 113 S.Ct. at 2225–26 (noting that petitioners' assertion that animal sacrifice was an integral part of their religion was neither bizarre nor incredible), such evidence may be relevant to overcome any claim that the impact of the challenged law is *de minimis*. Moreover, a rule that bans a practice that is not "central" to an adherent's religious practice might nonetheless impose a substantial burden, if the practice is important and based on a sincere religious belief.

■ A court may also consider whether the litigants' beliefs find any support in the religion to which they subscribe, or whether the litigants are merely relying on a self-serving view of religious practice. This inquiry is not a matter of deciding whether appellants' beliefs accord in every particular with the religious orthodoxy of their church. *See Smith*, 494 U.S. at 887, 110 S.Ct. at 1604 (holding that courts should not question the "validity of particular litigants' interpretations" of their creeds) (citing *Hernandez v. Comm'r*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1989)). Nor is it a matter of adjudicating intrafaith differences in practice or belief. *See Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981) (holding that "it is not within the judicial function and judicial competence to inquire whether the petitioner or [another member of his faith] more correctly perceived the commands of their common faith," because "[c]ourts are not arbiters of scriptural interpretation"). Instead, a court may determine whether the litigants' views have any basis whatsoever in the creed or community on which they purport to rest their claim. For example, a Catholic litigant who asserted that it was part of his religion to wear sunglasses would be making a claim "so bizarre ... as not to be entitled to protection" under the First Amendment. *Id.* at 715, 101 S.Ct. at 1431. The litigant's assertion of a view so totally foreign to the creed with which he claimed to affiliate might well lead the court to question his sincerity. It is therefore unlikely that a litigant challenging a rule limiting his right to wear sunglasses could satisfy the threshold requirement.

In the instant case, the District Court apparently assumed that the plaintiffs could not satisfy the threshold test, because the religious practice at issue was not mandatory. As noted above, the trial court's ruling on this point was in error. Therefore, on remand, the District Court must first determine whether plaintiffs' claim passes the threshold test, and then consider whether plaintiffs have met their burden under the *Turner/O'Lone* test. We explain below.

**D. What Must Be Done on Remand**

■ We remand to the District Court to determine whether appellants have met the threshold requirement of showing a substantial burden on the free exercise of their religion. They certainly have raised a genuine issue of material fact regarding the question, rendering the District Court's grant of summary judgment inappropriate. Appellees did not contest that appellants' beliefs are both religious and

sincerely held. *See* Br. for Appellees at 7 n.7. The record also includes evidence that the practice of taking wine with Communion is important in terms of appellants' religious beliefs. For example, the record indicates that appellants have regularly attended Mass and taken wine at Communion throughout their incarceration and for years prior to their incarceration. *See* Levitan Decl. ¶¶ 3, 7, *reprinted in* J.A. 69-70; Leonardo Decl. ¶¶ 3-4, *reprinted in* J.A. 75-76. This suggests that taking wine with Communion is not an unimportant part of appellants' religious practice. In their complaint, appellants also alleged that they believed it to be the command of the Lord Jesus Christ to consume both bread and wine, because the sign of Communion is more complete when given under both species, although no similar statements appear in their declarations. Am. Compl. ¶ 33, *reprinted in* J.A. 32.

The record further indicates that the practice of consuming wine during Communion has a readily identifiable basis in the practices of many Catholics and in church doctrine. Sister VanBaalen's declaration confirms that appellants' belief that Communion is more complete as a sign when received under both species has a basis in their creed. VanBaalen Decl. ¶ 4, *reprinted in* J.A. 51. The record additionally demonstrates that taking wine with Communion is a practice that was recognized in many of the religious settings in which appellants have practiced, including in their various places of incarceration. Levitan Decl. ¶ 3, *reprinted in* J.A. 69-70 (stating that appellant was given wine with Communion, presumably by Catholic prison chaplains, at prisons in Petersburg, Virginia; Yazoo City, Mississippi; and Pensacola). In short, the taking of wine with Communion cannot be viewed as a trumped-up practice that appellants have conveniently labeled "religious." The fact that some other Catholics only consume the species of bread is not dispositive, nor

are the statements of clergy that the taking of wine by congregants is not a mandatory element of the ritual.

While appellants have raised a genuine issue of fact regarding the threshold test, the exact nature of their belief in wine's religious importance is not entirely clear. Some of the most fervent statements of their beliefs appear in their complaint but not in their respective declarations. Rather than prejudge the issue, we remand so that the District Court can make the required determination. And regardless of its decision on the threshold inquiry, the District Court should also conduct the appropriate balancing analysis under *Turner* and *O'Lone* to determine whether the BOP regulation is reasonably related to legitimate penological interests. If there is any future appeal in this case, the appellate court may benefit from findings by the District Court on both the threshold issue and the *Turner/O'Lone* test.

The *Turner* and *O'Lone* inquiry should focus on whether the change in regulatory regimes – from one in which Catholic inmates could consume wine through intinction to one in which only the chaplain is permitted to consume wine – is justified by a legitimate penological interest. In making this assessment, the District Court must bear in mind that, under the new rule, the prison still allows alcohol to be consumed on the prison grounds and in prisoners' presence under the supervision of the chaplain. The narrow question will be whether the ban on the chaplain's actually administering wine to the inmates, as opposed to merely drinking it in their presence, is justified.

While the four *Turner* factors are not a mandatory part of the balancing test, the Supreme Court held them out as relevant and useful. First, the District Court should determine whether there is a valid, rational connection between the prohibition and any legitimate governmental in-

terest put forward to justify it. The relationship between the interest and the rule must be rational, so that if the interest were the prevention of drunkenness among inmates, the prison would have to explain how that interest is implicated by the negligible amount of wine ingested through intinction. Under the second *Turner* factor, the District Court should consider whether the inmates have alternatives open to them. Third, the District Court should consider the impact on the prison and on other inmates of allowing the Catholic prisoners to consume wine along with the chaplain during Communion. Finally, the court should consider the availability of alternatives to the rule. Under this prong, the court should evaluate any asserted problems with the previous policy of allowing inmates to consume small amounts of wine during Communion. *See Turner*, 482 U.S. at 89-91, 107 S.Ct. at 2261–63. Because appellees submitted no evidence relevant to the *Turner* and *O'Lone* analysis, the District Court should conduct further factfinding on this issue.

### III. Conclusion

For the foregoing reasons, we reverse the decision of the District Court and remand the case to the District Court for further proceedings consistent with this opinion.