196 F.3d 316 (2nd Cir. 1999)
 NATHANIEL JACKSON, Plaintiff-Appellant,
v.
LOUIS F. MANN, Superintendent, Shawangunk C.F.; PAUL LEVINE, Deputy Superintendent for Programs, Shawangunk C.F.; D. TAYLOR, Inmate Grievance Supervisor, Shawangunk C.F.; A. GOODMAN, Jewish Rabbi, Shawangunk C.F.; LEAH BRUNSON, Counselor, Shawangunk C.F., Defendants-Appellees.
 Docket No. 97-2968
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: September 24, 1999
Decided: November 05, 1999
 
 Plaintiff appeals from an order of the United States District Court for the Northern District of New York (McAvoy, C.J.), granting defendants' motion for summary judgment.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 SARAH BETH LANDAU, Coudert Brothers, New York, NY (Douglas F. Broder, of counsel), for Plaintiff-Appellant.
 JULIE S. MERESON, Assistant Attorney General, State of New York, Albany, NY (Eliot Spitzer, Attorney General, State of New York, Peter H. Schiff, Deputy Solicitor General, State of New York, Nancy A. Spiegel, Assistant Attorney General, State of New York, of counsel), for Defendants-Appellees.
 Before: WINTER, Chief Judge, KEARSE, AND McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 BACKGROUND
 
 1
 Because this is an appeal from a grant of summary judgment for defendants, we review the evidence in the light most favorable to the plaintiff, the nonmoving party.
 
 
 2
 Nathaniel Jackson, an African-American, has been an inmate in the New York State prison system since 1986. When Jackson entered the prison system in 1986, he identified himself as Jewish. Jackson thereafter participated in the prison system's alternative kosher diet program at various correctional facilities until his transfer to Shawangunk Correctional Facility ("Shawangunk") in August 1995. Under New York Department of Correctional Services ("DOCS") policy, eligibility for the kosher diet program is determined by a prison's Jewish Chaplain "through a process of interview and review of documentation to substantiate the inmate's Judaic background and intent to strictly observe Jewish dietary law."Upon his arrival at Shawangunk, Jackson again listed his religious preference as Jewish and asked to be placed in the kosher diet program so that he could receive kosher meals as part of his religious practice. His request was granted pending a formal determination of his eligibility for the kosher diet program by the prison's Jewish Chaplain, Rabbi Goodman. Rabbi Goodman told Jackson that he could approve a kosher diet only if Jackson was in fact Jewish. There are only two ways to be Jewish, Rabbi Goodman explained: you had to be born Jewish or had to have completed a formal conversion process.
 
 
 3
 Jackson disagreed with these strictures and claimed that he was Jewish because he read the Torah and ate kosher food. He told Rabbi Goodman that his prison records would confirm his Jewish status. The rabbi gave Jackson a Congregational Questionnaire which asked about his Jewish practices, but Jackson only partially completed it. Jackson later told Rabbi Goodman that he had indeed been born Jewish, but the rabbi was unable to reach Jackson's mother to substantiate this claim and Jackson himself declined to contact his mother for "fear of upsetting her."
 
 
 4
 In September 1995, based on Rabbi Goodman's finding that Jackson had not offered sufficient evidence that he is Jewish, Jackson was removed from the kosher diet program. He refused for eight days to eat the non-kosher food provided to him.
 
 
 5
 Previously, in August 1995, Jackson had filed a grievance with the Shawangunk Inmate Grievance Resolution Committee ("IGRC") complaining that he was being denied a kosher diet. Duane Taylor, an Inmate Grievance Supervisor, met with Jackson and agreed to investigate his complaint. After several meetings with Jackson, Taylor forwarded the grievance to Louis Mann, the Superintendent of Shawangunk, who denied it on the grounds that Jackson had not completed the questionnaire and that it was beyond the scope of the IGRC to determine whether or not Jackson was Jewish, especially while Rabbi Goodman was in the process of doing just that. Mann's decision was later reviewed and confirmed by the Central Office Review Committee, which noted that Jackson could not be considered Jewish because he did not provide Rabbi Goodman with the proper acceptable documentation as prescribed by the New York Board of Rabbis. Paul Levine, the Deputy Superintendent of Shawangunk, then sent Jackson a memo reiterating that his eligibility for participation in the kosher diet program depended on more than his just saying that he is Jewish.
 
 
 6
 In late 1995, Jackson commenced this pro se action under 42 U.S.C. 1983 against Rabbi Goodman and various other prison officials in the United States District Court for the Northern District of New York (McAvoy, C.J.). He alleged that the prison officials' refusal to provide him with a kosher diet violated his rights under: (1) the Free Exercise Clause of the First Amendment; (2) the Fourteenth Amendment Equal Protection and Due Process Clauses; and (3) the Eighth Amendment's provisions against cruel and unusual punishment. Jackson later added a Religious Freedom Restoration Act claim in an amended complaint.
 
 
 7
 He sought money damages and an injunction requiring the prison officials to provide him with a kosher diet. Jackson also moved for a preliminary injunction, but that motion was denied as moot when the prison officials agreed to provide him with kosher meals pending the outcome of this litigation. Apparently that agreement remains in effect, and Jackson continues to receive kosher meals. Preferring to remain embroiled in this litigation, however, prison officials have refused to grant Jackson such meals indefinitely.
 
 
 8
 After some discovery, Jackson moved for summary judgment arguing that he had practiced Judaism both before and during his incarceration, and that he followed Jewish dietary laws. Jackson attached an affidavit, purportedly from his mother, "Mary Jackson," stating that she had raised him according to the Jewish faith. He also attached prison records listing his religious preference as Jewish and institutional records showing that he had participated in kosher diet programs at other New York prison facilities.
 
 
 9
 The prison officials cross-moved for summary judgment. They argued that: (1) Jackson did not demonstrate that he was Jewish; (2) his claims failed under the (now invalidated) Religious Freedom Restoration Act, 42 U.S.C. 2000 bb-1 (1993); and (3) they were protected by qualified immunity. The prison officials attached an affidavit from Rabbi Goodman, in which he stated that a Jew is a person who is born Jewish or has formally converted to Judaism. In his affidavit, Rabbi Goodman stated that Jackson never claimed to have formally converted to Judaism and that various statements in Jackson's institutional records conflicted with Jackson's assertion that he had been born Jewish. Specifically, Jackson's records showed that: (1) in 1981 he indicated that he followed no religion; (2) in 1982 he changed his religious status from "none" to Muslim; and (3) in 1983 he again apparently indicated that he had no religious beliefs. Accordingly, Rabbi Goodman found that Jackson had failed to show that he was Jewish.
 
 
 10
 The district court granted summary judgment to the prison officials and denied Jackson's motion. The district court addressed only Jackson's free exercise claim. Relying on Rabbi Goodman's statement that "a Jew is one who was born Jewish or has formally converted," the court found that Jackson had produced no proof that he was a Jew according to the practices of the Jewish religion, and concluded:
 
 
 11
 The New York State Department of Correctional Services, in adhering to the[] standards [of the Jewish religion], is not denying plaintiff access to the steps necessary to become Jewish. They [sic] are merely restricting the "Alternative Kosher Diet" program to those inmates who are in fact Jewish. This being the case, there are no triable issues of fact.
 
 
 12
 The district court then dismissed Jackson's action in its entirety.
 
 
 13
 Jackson now appeals with counsel appointed by this Court. This Court has already dismissed Jackson's appeal against defendants Taylor and Brunson. He argues that the district court: (1) improperly granted summary judgment to the prison officials on his free exercise claim because the court failed to determine whether Jackson's religious beliefs were "sincerely held"; and (2) improperly denied his own motion for summary judgment.
 
 
 14
 For the reasons set forth below, we affirm in part, reverse in part and remand.
 
 DISCUSSION
 
 15
 We review the district court's decision to grant summary judgment de novo. See Bedoya v. Coughlin, 91 F.3d 349, 351 (2d Cir. 1996).
 
 
 16
 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 
 17
 I. The Prison Officials' Motion for Summary Judgment
 
 
 18
 Jackson contends that the district court erred when it concluded that there were no triable issues of fact. The prison officials argue that: (1) the district court properly granted summary judgment; and (2) even if they were not entitled to summary judgment on all of Jackson's claims for relief, they were at least entitled to qualified immunity on Jackson's claim for money damages.
 
 A. The Free Exercise Claim
 
 19
 The Free Exercise Clause of the First Amendment is an "unflinching pledge to allow our citizenry to explore . . . religious beliefs in accordance with the dictates of their conscience." Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984). Prisoners retain their right to religious freedom even when incarcerated. See Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997). An inmate is therefore entitled to a reasonable accommodation of his religious beliefs. See Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir. 1975). This includes religious dietary beliefs, as "prison officials must provide a prisoner a diet that is consistent with his religious scruples." Bass v. Coughlin, 976 F.2d 98, 99 (2d Cir. 1992)(per curiam).
 
 
 20
 In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." Jolly v. Coughlin, 76 F.3d 468, 476 (2d Cir. 1996). Instead, the inquiry is "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious." Patrick, 745 F.2d at 157 (quoting United States v. Seeger, 380 U.S. 163, 185 (1965)) (alteration in original) (emphasis added). A claimant need not be a member of a particular organized religious denomination to show sincerity of belief. See Frazee v. Illinois Dep't of Employment Sec., 489 U.S. 829, 834 (1989).
 
 
 21
 The district court erred by granting summary judgment to the prison officials on Jackson's freedom of religion claim. In making its decision, the district court relied on Rabbi Goodman's statement that "a Jew is one who was born Jewish or has formally converted" to conclude that Jackson is not "in fact Jewish" according to the "practice of the Jewish religion." This reasoning erroneously substituted the objective "accuracy" of Jackson's assertion that he is Jewish for the correct test - whether Jackson's beliefs are "sincerely held."
 
 
 22
 Viewed through the prism of sincerity, Jackson has produced sufficient evidence to raise a genuine issue of material fact as to whether his religious beliefs are "sincerely held." He submitted prison documentation that: (1) listed his religious preference as Jewish; (2) showed his participation in kosher meal programs in several other correctional facilities; and (3) showed that he had actually gone without food for several days to avoid eating non-kosher food. He also submitted an affidavit from his mother, in which she stated that she had raised Jackson according to the Jewish faith and dietary laws.
 
 
 23
 The prison officials never mentioned the "sincerely held belief" standard or challenged the sincerity of Jackson's beliefs. Instead, they continue to assert that we should simply uphold the DOCS policy of deferring to Jewish religious authorities on the question whether an inmate is Jewish for purposes of the kosher diet program. This argument might have merit if the DOCS policy furthered some legitimate penological interest. See Farid v. Smith, 850 F.2d 917, 925 (2d Cir. 1988) ("[A] prison regulation that impinges on inmates' constitutional rights may be valid if it is reasonably related to legitimate penological interests."). However, the prison officials have not cited any penological objective advanced by relegating to religious authorities the decision whether someone is or is not Jewish for purposes of the kosher diet program. While the prison officials may assure themselves that Jackson's religious beliefs are sincerely held, see Jackson-Bey, 115 F.3d at 1096-97, they need not - indeed cannot - determine "the objective truth of [his] beliefs." Patrick, 745 F.2d at 157.
 
 
 24
 The prison officials maintain that the question of Jewish status is an "ecclesiastical question" beyond the competence of the courts, and is best left to the prison's religious authorities. We disagree because the question whether Jackson's beliefs are entitled to Free Exercise protection turns on whether they are "sincerely held," not on the "ecclesiastical question" whether he is in fact a Jew under Judaic law. Courts are clearly competent to determine whether religious beliefs are "sincerely held." See, e.g., Farid, 850 F.2d at 926.
 
 
 25
 For the foregoing reasons, the district court erred when it granted summary judgment to the prison officials on Jackson's freedom of religion claim. A remand is therefore necessary to determine the sincerity of Jackson's religious beliefs.
 
 B. Jackson's Other Claims
 
 26
 Jackson mounts two additional constitutional arguments, neither of which has merit. First, he argues that by allowing Rabbi Goodman to decide which prisoners should be considered Jewish, the prison "excessively entangled" the state with the Jewish faith in violation of the Establishment Clause of the First Amendment. Although this argument is muddied, it essentially restates Jackson's Free Exercise claim - that the prison officials unconstitutionally refused to provide him with a kosher diet because they did not consider him "Jewish" under Judaic law. This argument is more properly anchored in the Free Exercise Clause than the Establishment Clause. See, e.g., Patrick, 745 F.2d at 158.
 
 
 27
 Second, he argues that the prison officials violated his equal protection rights by requiring him to prove that he is Jewish according to Judaic law while allowing members of other religions to practice their religions without making a similar showing. This contention fails, however, because Jackson presented no evidence whatsoever that he was treated differently from similarly situated members of other religions. See Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995).
 
 C. The Qualified Immunity Defense
 
 28
 In general, public officials are entitled to qualified immunity if: (1) their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe their acts did not violate those rights. See Weyant v. Okst, 101 F.3d 845, 857 (2d Cir. 1996).
 
 
 29
 The prison officials are not entitled to qualified immunity. When the prison officials denied Jackson's requests for a kosher diet, it was clearly established that: (1) "prison officials must provide a prisoner a diet that is consistent with his religious scruples," Bass, 976 F.2d at 99; and (2) the Free Exercise Clause affords protection to religious beliefs which are "sincerely held," Patrick, 745 F.2d at 157. Because these rights were clearly established at the time of the alleged deprivation,[1] and because the prison officials offer no reason to conclude that their acts were "objectively reasonable," the prison officials are not entitled to qualified immunity. See Bass, 976 F.2d at 99 (holding that prison officials were not entitled to qualified immunity when they refused inmate's religiously motivated dietary requests).
 
 II. Jackson's Motion for Summary Judgment
 
 30
 Jackson argues that his own motion for summary judgment should have been granted because he did demonstrate the sincerity of his belief in the Jewish faith. We disagree.
 
 
 31
 Jackson has not shown that he is entitled to summary judgment on his free exercise claim. Although there is evidence in the record from which a factfinder could conclude that Jackson "sincerely" believes that his religion requires him to eat a kosher diet, there is also countervailing evidence from which a factfinder could draw the opposite conclusion. While Jackson told Rabbi Goodman that he was born Jewish, and also that he has held his beliefs since childhood, his prison records show that in 1981 he indicated that he followed no religion, that in 1982 he changed his religious status from none to Muslim and that in 1983 he again apparently indicated that he had no religious beliefs. In addition, one of Jackson's prison grievances states that he has been a practicing Jew for only seven years. Based on Jackson's numerous conflicting statements, a reasonable jury could doubt the sincerity of his beliefs. The district court did not err when it denied Jackson's summary judgment motion.
 
 III. Injunctive Relief
 
 32
 Jackson argues that he should be granted preliminary injunctive relief in the form of kosher meals.
 
 
 33
 This request is moot because the parties have agreed that he will continue to receive a kosher diet pending the outcome of this litigation. We therefore reject the motion for injunctive relief, without prejudice to a renewal should Jackson's kosher diet be interrupted.
 
 CONCLUSION
 
 34
 We have considered the parties' remaining contentions and find them to be without merit. Accordingly, we AFFIRM the denial of the appellant's motion for summary judgment, REVERSE the grant of the appellees' motion for summary judgment and REMAND for further proceedings.
 
 
 
 Notes:
 
 
 [1]
 It has not escaped our notice that for almost ten years in other prisons, Jackson got kosher meals. Why the Shawangunk Facility saw fit to make an issue of Jackson's status as a Jew, engaging the attention of four federal judges (so far) remains an enigma.