**Wayne FORD, Plaintiff,**

v.

**John MCGINNIS, Superintendent; Patrick McGann, Superintendent of Administration; Gordon Lord, Assistant Deputy Superintendent, Defendants.**

**No. 00 CIV. 3437(SAS).**

United States District Court,
S.D. New York.

June 14, 2002.

Stuart W. Gold, Esq., Rachel G. Skaistis, Esq., Cravath, Swaine & Moore, NY, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Attorney General of the State of New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Wayne Ford brings suit under 42 U.S.C. § 1983 against John McGinnis, Patrick McGann and Gordon Lord, all of whom are officials of the New York State Department of Correctional Services ("DOCS") at Downstate Correctional Facility ("Downstate"). Plaintiff alleges that while he was incarcerated at Downstate, defendants failed to provide him with a religious celebratory meal in violation of the Free Exercise Clause of the First Amendment.

Defendants now move for summary judgment under Federal Rule of Civil Procedure 56(c). Defendants contend that there was no First Amendment violation and, even if there were such a violation, they are immune from suit under the doctrine of qualified immunity. For the reasons stated below, defendants' motion is granted.

### I. FACTS

Ford has been a practicing Muslim since 1993. *See* Declaration of Wayne Ford ("Ford Decl.") ¶ 3; Deposition of Wayne Ford ("Ford Dep."), Ex. F to the Declaration of Rachel G. Skaistis, plaintiff's attorney ("Skaistis Decl."), at 16. In

September 1997, Ford submitted a religious designation form, officially notifying DOCS that he is a follower of Islam. *See* Religious Designation Form, Ex. A to Ford Decl.

### A. Ramadan and Eid ul Fitr

In Islam, there are two major religious observances: the Eid ul Fitr and the Eid ul Adha.[1] *See* Umar Dep. at 26. The Eid ul Fitr, a joyous occasion, celebrates the successful completion of the observance of Ramadan.[2] *See* Rahim Dep. at 61–62. The Eid ul Fitr celebration comes at the end of Ramadan and signifies its successful completion. *See* Umar Dep. at 32–33. The Eid ul Fitr is of great significance to Muslims who view it as a "religious instruction". *See* Rashada Dep. at 62; Rahim Dep. at 62.

The Eid ul Fitr celebration consists of an Eid ul Fitr prayer and an Eid ul Fitr feast. *See* Rashada Dep. at 63; Umar Dep. at 38. On the morning of the first day of the Eid ul Fitr, Muslims congregate

for the Eid ul Fitr prayer. *See* Rahim Dep. at 63. Before leaving for the prayer, however, Muslims eat a small, sweet breakfast. *See* Umar Dep. at 32, 34. Following the Eid ul Fitr prayer, Muslims partake in the Eid ul Fitr feast.[3] *See id.* at 34. The Eid ul Fitr feast is a substantial meal that typically comprises halal meat, fish, vegetables, breads, cakes, pies and beverages. *See id.* at 38–39.

### B. Observance of Eid ul Fitr Within DOCS

#### 1. Religious Faith's Holy Day Calendar

DOCS issues an annual "Religious Faith's Holy Day Calendar" setting forth an "outline of the fea[s]ts and fasts for the various religious faith groups represented and verified in the New York State Department of Corrections facilities". *See* Year 2000 Religious Faith's Holy Day Calendar ("Calendar"), Ex. J to Skaistis Decl.

---

1. The following background information is derived from the testimony of Ismail A. Rahim ("Shaykh Rahim"), Imam Rashada, and Imam Warith–Deen Umar.

   Shaykh Rahim is employed by DOCS as a Ministerial Program Coordinator for Islamic affairs. *See* Deposition of Shaykh Ismail A. Rahim ("Rahim Dep."), Ex. G to Skaistis Decl., at 11. As such, Shaykh Rahim oversees all of the Muslim chaplains in the DOCS system. *See id.*

   Hamin Rashada is an Imam, trained in the Qu'ran. *See* Deposition of Imam Hamim Rashada ("Rashada Dep."), Ex. I to Skaistis Decl., at 11. Hamin Rashada was chaplain at Downstate during December 1999 and January 2000. *See id.* at 13.

   Imam Umar was the Ministerial Program Coordinator for DOCS in December 1999 and January 2000. *See* Deposition of Imam Warith–Deen Umar ("Umar Dep."), Ex. H to Skaistis Decl., at 8. As such, Imam Umar was responsible for the supervision of all Muslim chaplains within DOCS. *See id.* at 11.

2. Ramadan is the name of the ninth month of the lunar calendar. *See* Umar Dep. at 27.

During each day of the month of Ramadan, observant Muslims fast from dawn until sunset. *See id.* at 27–28. Before dawn each day of Ramadan, Muslims eat a morning meal or "Sahoor" to prepare them for the rigors of the daily fast. *See id.* at 28. Following sunset each day of Ramadan, Muslims eat an evening meal or "Iftar" to break their daily fast. *See* Rashada Dep. at 55–56. The sighting of the new moon signals the conclusion of Ramadan and that day becomes the last day of Ramadan fasting. *See id.* at 54–55. The fast on that last day is broken with an evening Iftar, the same meal used to break the daily fast every evening during Ramadan. *See* Rahim Dep. at 67; Ford Decl. ¶ 11.

3. Under Muslim law, the Eid ul Fitr feast should be served within three days of the conclusion of Ramadan. *See* Rahim Dep. at 48–49. Accordingly, the Eid ul Fitr feast does not break the Ramadan fast but is celebrated after Muslims have broken the fast with an Iftar. *See id.* at 67–68.

The Religious Faith's Holy Day Calendar indicates January 7 as the date of the Eid ul Fitr which it describes as follows:

> Id–Ul–Fitr: Family Holy Day celebration. This is an observance of thanksgiving, gift giving, etc. On the first day following the end of Ramadan, a communal prayer and feast are celebrated with family. When this day falls on a weekday, the festivities may be moved to a weekend day in order to accommodate the families who will be participating. There will be a special *Id.* prayer and there is to be no work on the day of the *Id.* (Inmates may be permitted refreshments on the day of the *Id.*, if it occurs during a weekday). Additional information on this celebration will be distributed at a later date.

*Calendar* at 38. According to Superintendent of Downstate John McGinnis, events listed on the Calendar, including the Eid ul Fitr family holy day celebration, are observances recognized by DOCS as holy days. *See* Deposition of John McGinnis ("McGinnis Dep."), Ex. L to Skaistis Decl., at 27, 47.

### 2. 1999/2000 Ramadan Menu

Each year, the Director of Nutritional Services sends a memorandum to all DOCS facilities setting forth a standardized, state-wide menu for the Ramadan meals and the Eid ul Fitr feast. *See* 9/13/99 Memorandum from Howard Dean, Director of Nutritional Services, to Correctional Facility Superintendents, Ex. B to Ford Decl. All DOCS facilities are directed to follow the state-wide menu. *See* McGinnis Dep., at 38–39. For 1999–2000, the Ramadan Menu included provisions for both Sahoor (pre-dawn) and Iftar (evening) meals. *See* Ramadan Statewide Menu 1999–2000, attached to 9/13/99 Dean Mem. DOCS facilities are directed to serve all observant Muslims, including Muslims in Special Housing Units ("SHU"), with the Sahoor and Iftar meals. *See* Umar Dep. at 43–44, 48.

The Ramadan Menu also sets forth the items comprising the Eid ul Fitr feast. Under a heading entitled "Id–Ul–Fitr January _____, 2000," the menu lists Halal Chicken, Whiting, Rice, Sweet Potatoes, Tossed Salad w/ Dressing, Fruit Salad, Banana, Broccoli, Bean Pie and Beverage. This menu comports with the traditional Eid ul Fitr feast consumed by Muslims outside the prison system. *See* Umar Dep. at 38–39; Rahim Dep. at 64. DOCS facilities are directed to serve observant Muslim inmates—including Muslim inmates in SHU—the Eid ul Fitr feast set forth in this state-wide menu. *See* Deposition of James O'Connell, Deputy Superintendent of Downstate ("O'Connell Dep."), Ex. K to Skaistis Decl., at 44–45.

### 3. Memorandum from Imam Umar

The Division of Ministerial Services is responsible for planning and coordinating religious observances and activities for DOCS. *See* DOCS Directive 4200, Ex. M to Skaistis Decl. Specifically, "[t]he mission of the Division is to ... [e]nable inmates to practice their religious faith and fulfill their religious obligations in accordance with the provision of the U.S. Constitution guaranteeing all citizens the right to free exercise of their religion". *Id.* at 1.

The Ministerial Program Coordinator for Islamic Affairs oversees all Islamic chaplains that work for DOCS and coordinates Islamic observances, prayers and classes. *See* Rahim Dep. at 11; Umar Dep. at 9. From 1985 through August 2000, Imam Umar was the Ministerial Program Coordinator for Islamic Affairs. *See* Umar Dep. at 8. The current Ministerial Program Coordinator for Islamic Affairs is Shaykh Rahim.

In September 1999, Imam Umar drafted and circulated a memorandum entitled

"Accommodations for Confined Inmates" to Muslim chaplains and facility superintendents. *See* 9/14/99 Memorandum from Imam Umar ("Umar Mem."), Ex. N to Skaistis Decl. The memorandum stated:

A major concern of Muslim prisoners in special housing units and keeplock status is their accommodations during the month of Ramadan fast. With Ramadan and the two Ids coming soon, this is a good time to remind you and advise you to include the service of confined Muslims in your ministerial plans for Ramadan and the Ids. These inmates, more than often, will participate in the fast. Arrangements should be made for them to receive their evening meals in time for properly breaking the fast. *They should also be able to receive the Id meals.*

*Id.* (emphasis added).

### C. Eid ul Fitr at Downstate in January 2000

During Ramadan 1999/2000, Downstate served the Ramadan meals to all observant Muslim inmates, including SHU inmates. *See* Deposition of Gordon Lord, Assistant Deputy Superintendent at Downstate ("Lord Dep."), Ex. O to Skaistis Decl., at 33–34. Muslim SHU inmates received their Ramadan meals on "feed up" trays delivered to their cells. *See id.* at 34.

The Eid ul Fitr was observed at Downstate in the year 2000 as follows. On January 7, 2000, Downstate permitted Muslim inmates to congregate for the Eid prayer. *See* 1/5/00 Memorandum from Reverend Milton Ortquist, Coordinating Chaplain, Ex. P to Skaistis Decl. There appears to be a factual dispute, however, as to when the actual Eid ul Fitr feast was served. Although Lord testified that the morning services consisting of orange juice, coffee cake, coffee, milk and sugar

constituted the Eid ul Fitr meal as it was the actual break of the Ramadan fast,[4] *see* Lord Dep. at 43, he later conceded that DOCS directives "indicate that the family celebration can be put off to a different date." *Id.* Patrick McGann, Deputy Superintendent of Administration at Downstate, similarly testified that the Eid ul Fitr meal was served on January 7, 2000, but he could not recall the contents of the meal that was served. *See* Deposition of Patrick McGann ("McGann Dep."), Ex. C to the Affidavit of Michael J. Keane, Assistant Attorney General ("Keane Aff."), at 54–55. According to plaintiff, the Eid ul Fitr feast described in the Ramadan menu was served at a "Eid–ul–Fitr Family Day Event" held on January 15, 2000. *See* Ford Decl. ¶ 17. That meal was not served to inmates, like Ford, who were confined to SHU. *See* McGinnis Dep. at 61–62.

In the year 2000, Ford ended his Ramadan fast on January 6, 2000, at Rikers Island, with an evening Iftar. *See* Ford Decl. ¶ 15. On January 7, 2000, Ford was transferred to Downstate where he was housed in SHU. *See id.* ¶ 16. On January 10, 2000, Ford sent a letter to Imam Hamim Rashada, Downstate's Muslim Chaplain. *See* 1/10/00 Letter from Ford to Rashada, Ex. G to Keane Aff. Ford's letter stated that he was an observant Muslim and asked that "[his] name be placed on the list to receive a meal from the upcoming Eid al Fitra". *Id.* When Imam Rashada informed plaintiff that inmates housed in SHU were prohibited from receiving the Eid ul Fitr meal, Ford filed a grievance. *See* Ford Decl. ¶ 18.

In his January 10, 2000 grievance, Ford requested that he be provided a "meal from the upcoming Eid al Fitra that will be held at Downstate on 1/15/00." *See* 1/10/00 Ford Grievance, Ex. F to Keane

---

4. Ford does not believe that these light refreshments are sufficient to complete the observance of the Eid ul Fitr. *See* Ford Decl. ¶ 24.

Aff. Ford described his grievance as follows:

> I am a Muslim in SHU. Today Imam Rashida brought to my attention that Downstate C.F. denies Muslims on keeplock or in SHU our meals from the Eid Al Fitra and Eid Al Ahda. The Eid Al Fitra and Eid Al Ahda are two Islamic holidays that are constitutionally protected even in prison. Downstate C.F. is the only prison in DOCS that denies Muslims in SHU or keeplock our Eid Al Fitra and Eid Al Ahda meals.

*Id.*[5]

On January 13, 2000, Ford sent a letter to Superintendent McGinnis basically restating the above grievance. *See* 1/13/00 Letter from Ford to McGinnis, Ex. H to

Keane Aff. As with the grievance, Ford's January 13, 2000 letter requested that he be provided with the meal from the Eid ul Fitr celebration held at Downstate on January 15, 2000. *See id.*

On January 20, 2000—five days after the January 15 Eid ul Fitr celebration—Assistant Deputy Superintendent Lord sent a memorandum to Ford regarding "feed up trays." *See* 1/20/00 Memorandum from Lord to Ford, Ex. S to Skaistis Decl. Lord's memorandum stated: "Your note to Imam Rashada was referred to me for reply. We do not send EID feed up trays to blocks. If you can attend an event you can go." *Id.* This was the only response Ford received with respect to his January 10 grievance and January 13 letter.[6]

---

**5.** On January 21, 2000, the Inmate Grievance Review Committee dismissed plaintiff's grievance because he had been transferred from Downstate to Southport Correctional Facility on that day. *See* 3/12/00 Letter from Ford to Earl Hughes, Inmate Grievance Program Supervisor, Ex. R. to Keane Aff. ("Hughes Letter"). On February 10, 2000, plaintiff wrote a letter to the Central Office Review Committee ("CORC"), complaining that he had not received a response to his January 10, 2000 grievance. *See* 2/10/00 Letter from Ford to CORC, Ex. S to Keane Aff. On March 7, 2000, the Director of the Inmate Grievance Program, Thomas G. Eagan, sent Ford a letter on behalf of CORC, informing him that he was obligated to seek review of the dismissal of his grievance from Downstate before appealing to CORC. *See* 3/7/00 Letter from Thomas G. Eagen to Ford, Ex. T to Keane Aff. While plaintiff sought review of the dismissal from Downstate, *see* Hughes Letter, he did not subsequently appeal to CORC. Accordingly, defendants argue that Ford failed to fully exhaust administrative remedies and that his claim should therefore be rejected.

Here, Ford took all but one of the required steps to pursue his grievance within the prison system. Appeal to CORC was to be taken after Ford sought review of the dismissal from Downstate. While Ford did seek such review, there is no evidence of Downstate's response. Under these circumstances, Ford was not obligated to pursue an appeal before hearing

from Downstate. Although all of the administrative remedies may not have been fully exhausted technically, Ford made a substantial effort to obtain administrative remedy. Accordingly, defendants' exhaustion argument is rejected. *Cf. Holloway v. Gunnell*, 685 F.2d 150, 154 (5th Cir.1982) ("[W]e do not think that a pro se complaint should be dismissed on its face by a technical reading of the available administrative procedures when plaintiff has made detailed allegations showing a substantial effort to obtain an administrative remedy"); *O'Connor v. Featherston*, No. 01 Civ. 3251, 2002 WL 818085, at *2 (S.D.N.Y. Apr. 29, 2002) (recognizing that *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), clarified those prison conditions subject to exhaustion but is otherwise silent as to what constitutes exhaustion—accordingly, court stated that an inmate may defeat a motion to dismiss where he has made a "reasonable attempt" to exhaust administrative remedies).

**6.** Both Imam Umar and Shaykh Rahim testified that Lord's memorandum is inconsistent with the memorandum circulated by Imam Umar as Ministerial Program Coordinator for Muslim Affairs. *See* Umar Dep. at 58; Rahim Dep. at 94–96. Shaykh Rahim further testified that Lord's memorandum is inconsistent with DOCS policy, including Directives 4200 and 4202. *See* Rahim Dep. at 96.

Despite plaintiff's grievance and his letters, he was not provided with the Eid ul Fitr meal served on January 15, 2000. *See* Ford Decl. ¶ 21. Accordingly, Ford did not receive an Eid ul Fitr meal for the 1999/2000 Ramadan season. *See id.* On January 7, 2001, while again housed in Downstate's SHU facility, Ford received the Eid ul Fitr meal. *See* Ford Decl. ¶ 27. That year, Ramadan ended on December 27, 2000, more than a week before the Eid ul Fitr meal was served on January 7, 2001. *See id.*

### D. The Family Day Event

Distinct from Directive 4202, entitled Religious Programs and Practices,[7] DOCS has a separate directive governing policy for special events, Directive 4022, "Special Events Program." *See* Directive 4022, Ex. O to Keane Decl. Among the events arranged by each DOCS facility are "Family Day Picnics," "Religious Holy Day Observances," and "Special Awards Programs." *See id.* at 2. Religious holy day observance are designated in a calendar attached to Directive 4202 and are listed after consultation with the Division of Ministerial Services. *See* Affidavit of John Loconte, Director of Ministerial and Family Services for DOCS ("Loconte Aff."), ¶ 13. On the other hand, Family Day Events, including the Eid ul Fitr Family Day Event, are not accorded any religious significance by DOCS, whether or not designated as a holy day event. *See id.* ¶ 18. In addition, inmates housed in SHU cannot attend special events such as Family Day Events. *See id.* ¶ 17.

More importantly, no Muslim cleric advising DOCS "has ever stated that any inmate's religion requires attendance at the DOCS-sponsor "Family Day Events" or requires consumption of food served at

such an event." *See id.* ¶ 19 ("In my experience, no religious advisor to DOCS has ever suggested that the special 'Family Day Events' observing holy days have any religiously-mandated significance."). For example, Shaykh Rahim testified as follows:

Q. If a Muslim SHU inmate at Downstate who had observed Ramadan and requested the Eid Ul Fitr meal through his Imam did not receive that meal, would that be a violation of DOCS policy?

A. Yes, ma'am.

Q. When I referred to the Eid Ul Fitr meal, I mean the meal . . . [consisting] or Halal chicken, banana, broccoli, pie, et cetera, is that your understanding also?

A. Within the three-day period you are talking about the Eid itself. Again, if it's post Eid, beyond the three days, you are talking about family event, comes under different directive. . . .

Q. But the menu—

A. Same menu would go to that and they can augment that by adding to it, whatever they want, same meal, same thing. *The religious need, the religious urgency of it was within the parameters of three days. Beyond that, it's a family event.*

Rahim Dep. at 76–77 (emphasis added). With regard to the timing of the Eid ul Fitr feast, Shaykh Rahim explained as follows:

Q. So only one Eid meal is served in DOCS, is that correct?

A. Yes.

---

**7.** This Directive concerns religious programs and practices within DOCS facilities and covers the religious rights of inmates within these facilities. *See* Directive 4202, Ex. V to Skaistis Decl.

Q. And it's just a question of when the Eid meal actually is served to the Muslim inmates.

A. Right.

Q. If DOCS does something like move the day that the Eid meal of Halal chicken and whiting, et cetera is served, does that in any way diminish the Muslim inmates' right to receive it?

A. No, it doesn't diminish the right of the inmate to receive it, but I am saying, it takes it out of one religious day of observance and bureaucratically it takes it out form 4202 and puts it under an inmate family event directives [sic], that's what it does, in real[i]ty.

*Id.* at 79–80. Imam Rashada made a similar distinction based on the date the Eid ul Fitr meal is served. *See* Rashada Dep. at 67 ("The Eid feast is separated by the date that it takes place. The date. If the date is not within those three days, the Eid is actually three days, anything outside of that, it's not even religious any longer. It's just a day."); at 93 ("Once those three days are gone, it could no longer be recognized as our Eid day."); at 109 ("But DOCS, the president, the pope, no one can move the religious Eid to a day because it falls on a weekend. Once you move it, it's no longer a religious day."). Imam Umar further clarified that Muslims are "not obligated to participate in the Eid. If they don't participate in the Eid they have not committed a sin, as opposed to something that is ordered by Allah in the Koran if they don't participate in it then they have committed a sin." Umar Dep. at 35–36.

### E. Plaintiff's Allegations

Ford sincerely believes that celebration of the Eid ul Fitr—including the Eid ul Fitr prayer and the Eid ul Fitr feast—is critical to his observance as a practicing Muslim. *See* Ford Decl. ¶¶ 6–7; Ford Dep. at 42–43. To Ford, an Eid ul Fitr feast should be a substantial meal consisting of various items such as halal meat, fish, salad, potatoes, vegetables and a dessert; a meal similar to the Eid ul Fitr feast described in the 1999/2000 Ramadan Menu. *See* Ford Decl. ¶¶ 8–9.

Ford understands that within the DOCS prison system, the Eid ul Fitr feast is often served a week or more after the conclusion of Ramadan. *See* Ford Decl. ¶ 13; Ford Dep. at 24–25. It is Ford's sincere belief that the Eid ul Fitr feast retains its religious significance even when served a week or more after the close of Ramadan. *See* Ford Decl. ¶ 14; Ford Dep. at 42–43. Accordingly, the Eid ul Fitr meal served on January 15, 2000 was of religious significance to plaintiff. *See id.* ¶ 22.

Ford alleges that as a result of defendants' refusal to provide him with the special religious Eid ul Fitr meal, he was "totally denied ... from participating in and enjoying [his] religious holiday of Eid al Fitra." Complaint ¶ 28. Plaintiff further alleges that the denial of his special religious Eid ul Fitr meal prohibited him from the free exercise of his religion. *See id.* ¶ 29.

## II. DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Shade v. Housing Auth. of New Haven,* 251 F.3d 307, 314 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must view the evidence "in the light most favorable" to the nonmovant. *See Breland–Starling v. Disney Publishing Worldwide,* 166 F.Supp.2d 826, 829 (S.D.N.Y.2001) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). A court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the nonmovant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505).

## B. Defendants Did Not Violate Plaintiff's First Amendment Rights

█ Defendants claim that their failure to provide plaintiff with the Eid ul Fitr meal served on January 15, 2000 did not violate the First Amendment because the January 15 meal was devoid of religious significance under the tenets of Islam. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def.Mem.") at 19. Defendants argue:

No First Amendment right has been implicated by prohibiting plaintiff from receiving a January 15, 2000 "Family Day Event" meal because neither DOCS, Downstate nor plaintiff could have made the special event a religious requirement. Plaintiff's claim that Islam required the January 15 meal is unsupported; the record shows that DOCS and Downstate designated the January 15 dates as a "Family Day Event," and that the Muslim lunar calendar required the observance of the Eid–ul–Fitr on January 7, 2000. Whatever defendants did or did not do on January 15, 2000, they did not deny an Islamic practice.

*Id.*

█ Prisoners retain their right to religious freedom under the First Amendment while incarcerated and are therefore entitled to a reasonable accommodation of their religious beliefs. *See Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) ("This includes religious dietary beliefs, as 'prison officials must provide a prisoner a diet that is consistent with his religious scruples.'") (quoting *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992)). The right to a reasonable accommodation of religious beliefs "may only be infringed to the extent that such infringement is reasonably related to legitimate penological interests." *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)).[8]

Plaintiff relies on *Jackson* for the proposition that any belief, whether religiously mandated or not, is entitled to First

---

**8.** All three defendants are aware that inmates retain their right to religious freedom under the First Amendment. *See* Lord Dep. at 18, 21–22; McGinnis Dep. at 27; McGann Dep. at 42–43. Regarding his source of religious training, Lord testified that "we receive guidelines from the Department of Ministerial Services that tell us what is a *reasonable* approach to an inmate's interpretation of what his rules are, or what his religious practice is." Lord Dep. at 22 (emphasis added).

Amendment protection as long as it is sincerely held and subjectively religious in nature. This interpretation is overbroad. *Jackson* more accurately stands for the proposition that an inmate's belief that he is a member of an established religion is entitled to First Amendment protection, so long as that belief is sincerely held.

In *Jackson,* an inmate filed suit after prison officials failed to provide him with kosher meals in accordance with Jewish dietary laws. *See Jackson,* 196 F.3d at 318. The prison's chaplain, Rabbi Goodman, concluded that Jackson was not Jewish—he had not been born Jewish nor had he converted to Judaism—and informed prison officials that because Jackson was not Jewish he was not eligible for kosher meals. *See id.* The district court granted defendants' motion for summary judgment based on Rabbi Goodman's finding that Jackson was not Jewish. *See id.* at 319.

The Second Circuit reversed, holding that the district court had "erroneously substituted the objective 'accuracy' of Jackson's assertion that he is Jewish for the correct test—whether Jackson's beliefs [that he is Jewish] are 'sincerely held.'" *Id.* at 320. Thus, whether Jackson's beliefs were entitled to Free Exercise protection turned on whether they were sincerely held, "not on the 'ecclesiastical question' whether he is in fact a Jew under Judaic law." *Id.* at 321. Adopting a subjective test, the court stated

> [i]n determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." Rather, the inquiry is whether the beliefs professed by a [claimant] are *sincerely held* and whether they are, in his own scheme of things, religious.

*Id.* at 320 (internal quotation marks omitted, emphasis and alteration in original).

Plaintiff asks this Court interpret the term "religious beliefs" as used in *Jackson* to include any individualized, subjective practice whether grounded in an authentic religion or not. Such an interpretation would extend First Amendment protection to the idiosyncratic practices of all inmates, no matter how unreasonable. For example, assume an inmate sincerely believes that he must drink actual blood while receiving Holy Communion under the tenets of Catholicism. Of course, he would be wrong as the "blood" received in that sacrament is symbolized with wine. But under plaintiff's interpretation of *Jackson,* that inmate's subjectively held belief would be entitled to religious accommodation. Surely the First Amendment does not mandate such a result.

■ Of course, the belief asserted by plaintiff—that Islam requires an Eid ul Fitr meal even when that meal is moved past the three day closing of Ramadan—is not as bizarre as this example. But plaintiff points to no limiting principle, nor can this Court find one, that would prevent plaintiff's interpretation of *Jackson* from overwhelming prisons with "sincerely held" religious beliefs. The fact is that defendants relied on the DOCS' Muslim clerics who informed them that when the Eid ul Fitr meal is moved past the required three day close of Ramadan—here to the weekend—it is *no longer of religious significance.*[9] *See supra* Part I.D. To force defendants to accommodate Ford's particularized view of Islam, after having been advised of Islam's actual requirements by religious experts, would unreasonably burden government officers in the performance of their duties. Accordingly, defendants did not violate Ford's First

---

**9.** With regard to religious expertise, plaintiff has not offered his own experts but has rather conceded that Shaykh Rahim speaks with authority. *See* Def. Mem. at 10, n. 4.

Amendment rights when they refused to provide him with the January 15 Family Day Event meal.[10]

### C. Qualified Immunity

■■■ The doctrine of qualified immunity "strikes a balance between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury." *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001) (internal quotation marks omitted). Accordingly, the qualified immunity defense is established where: "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002) (internal quotation marks and citations omitted).

The threshold inquiry is whether the facts alleged, construed most favorably to the plaintiff, "show the officer's conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Because plaintiff was not deprived of a constitutional right when he was denied the January 15 Family Day Event meal, there is no need to decide the issue of qualified immunity.

■■■ Nonetheless, as an alternative holding, I conclude that defendants are entitled to qualified immunity. Assuming Ford could establish a constitutional violation, "a judge evaluating a claim of quali-

fied immunity must [then] determine whether the federally protected right the defendant is accused of violating was clearly established at the time of the alleged violation." *Genas v. State of N.Y. Dep't of Corr. Servs.,* 75 F.3d 825 (2d Cir.1996) (citing *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

The right of an inmate to exercise his religion in a bona fide manner is clearly established. But, as noted earlier, Muslim clerics advised DOCS that the meal provided at the January 15 Family Day Event lost religious significance as it was moved past the three-day closing of the month of Ramadan. It was objectively reasonable for defendants to rely on this advice and not provide Ford with this meal which they believed was not religiously mandated. While Ford it entitled to practice his religion, defendants are entitled to rely on the undisputed advice of religious experts. Defendants are thus entitled to qualified immunity and are insulated from suit on this alternative basis.

### III. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is

---

10. Alternatively, given that the Muslim clerics testified that participation in the Eid ul Fitr is not religiously required and that the meal loses all religious significance when moved, deprivation of a post-Eid meal can be seen as a de minimis burden on Ford's religious freedom. *See Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (holding that the unavailability of a non-pork food tray for three meals out of 810 was a de minimis burden on an inmate's free exercise of religion, not giving rise to liability for a constitutional violation). De minimis burdens on the free exercise of religions are not of constitutional dimension. *See, e.g., Walsh v. Louisiana High Sch. Athletic Ass'n,* 616 F.2d 152, 158 (5th Cir.1980).

granted. The Clerk of the Court is directed to close this case.

SO ORDERED.