Wayne FORD, Plaintiff–Appellant,

v.

John McGINNIS, Superintendent, Pat-
rick McGann, Deputy Superintendent
of Administration, Gordon Lord, As-
sistant Deputy Superintendent, Defen-
dants–Appellees.

Docket No. 02–0205.

United States Court of Appeals,
Second Circuit.

Argued: Sept. 2, 2003.

Decided: Dec. 15, 2003.

Stuart W. Gold, Cravath, Swaine & Moore LLP (Rachel G. Skaistis, on the brief), New York, NY, for Plaintiff–Appellant.

Marion Buchbinder, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, on the brief), New York, NY, for Defendants–Appellees.

Before: SOTOMAYOR, WESLEY, Circuit Judges, and POLLACK, District Judge.[*]

SOTOMAYOR, Circuit Judge.

Plaintiff Wayne Ford ("Ford") is a practicing Muslim incarcerated within the New York State Department of Correctional Services ("DOCS"). This lawsuit arises out of the refusal of defendants John McGinnis, Patrick McGann, and Gordon Lord (collectively "defendants" or "prison officials"), to provide Ford one meal in January of 2000. The meal Ford claims he was denied, however, was not just any meal but the Eid ul Fitr feast, held once a year in conjunction with a daylong celebration marking the successful completion of Ramadan. Ford claims that by denying him this meal, prison officials infringed his constitutional rights under the Free Exercise Clause of the First Amendment. *See* U.S. Const. amend. I.

The district court (Scheindlin, J.) granted defendants' motion for summary judgment chiefly on the ground that the meal, which the prison served over a week after the period prescribed by Muslim law and tradition, had lost all objective religious significance due to its postponement and, therefore, did not warrant free exercise protection. *See Ford v. McGinnis*, 230 F.Supp.2d 338, 347–48 (S.D.N.Y.2002). Alternatively, the district court held that defendants were entitled to summary judgment because the denial of one religious meal is, in any event, a de minimis burden on Ford's religious exercise, *id.* at 348 n.

10, or because the defendants were entitled to qualified immunity, as the denial of the meal was not objectively unreasonable, *id.* at 348.

Ford did not cross-move for summary judgment below and does not argue on appeal that he is entitled to judgment as a matter of law, but rather he argues that his case was derailed prematurely. For the reasons discussed below, we agree and remand for the district court to determine whether the denial of the meal was reasonably related to a legitimate penological interest under the test applied in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

## BACKGROUND

Wayne Ford has been incarcerated within the DOCS prison system since 1989. Since 1993, he has indicated to prison officials that he is a Muslim.[2] The circumstances that led to Ford's failure to receive the Eid ul Fitr feast arose when Ford was transferred from Rikers Island to Downstate Correctional Facility ("Downstate") in conjunction with a court appearance on January 7, 2000. Coincidentally, this was the same day on which the Eid ul Fitr was observed at Downstate.

The Eid ul Fitr, according to the DOCS-employed religious authorities[3] whose testimony was before the district court, is one of two major religious observances in Is-

[*] The Honorable Milton Pollack, United States District Court for the Southern District of New York, sitting by designation.

2. These facts are recounted in the light most favorable to Ford and largely are taken from the facts as thoroughly set out by the district court. *See Ford,* 230 F.Supp.2d at 339–45.

3. The district court heavily relied on the testimony of two current and one former DOCS-

employees responsible for different aspects of setting and implementing DOCS policy regarding prisoners' observance of Islam within DOCS generally or at Downstate in particular. We refer to Hamin Rashada and Warith-Deen Umar, who are both Imams, and Shaykh Rahim collectively as the "DOCS religious authorities."

lam.[4] On the day of the Eid ul Fitr, Muslims celebrate the successful completion of the holy month of Ramadan, during which observant Muslims fast from sun up to sun down. The end of Ramadan is signaled by the sighting of the new moon, and Muslim law and tradition dictate that the Eid ul Fitr follow thereafter within three days. Celebration of the Eid ul Fitr typically begins with a sweet breakfast, followed by prayer, and later the Eid ul Fitr feast.

In 2000, Ramadan was called to an end when the new moon was sighted on January 6, and the Eid ul Fitr was celebrated at Downstate on the following day. Muslim prisoners, therefore, awoke on January 7 to a sweet breakfast and were then permitted to congregate for prayer. The traditional feast, however, was not held on that day. Rather, the feast was postponed to January 15, pursuant to the "Religious Faith's Holy Day Calendar," a DOCS-issued calendar describing "the feats [sic] and fasts for the various religious faith groups represented and verified" in DOCS. The calendar describes the Eid ul Fitr as follows:

> Family Holy Day celebration. This is an observance of thanksgiving, gift giving, etc. On the first day following the end of Ramadan, a communal prayer and feast are celebrated with family. When this day falls on a weekday, the festivities may be moved to a weekend day in order to accommodate the families who will be participating.

Imam Hamin Rashada, Downstate's Muslim Chaplain, authorized the postponement after consulting with some Muslim inmates who preferred to hold the event on a week-

end so that their families could attend. The foods composing the Eid ul Fitr feast[5] were therefore not served at Downstate on January 7, but instead were served on January 15.

Shortly after arriving at Downstate on January 7, Ford became aware that the Eid ul Fitr feast had been postponed. Although Ford was held in Downstate's Special Housing Unit ("SHU" or "keeplock"), a more restricted confinement reserved for prisoners who present disciplinary or other problems, he wrote to Imam Rashada on January 10—three days after all aspects of the Eid ul Fitr except the feast were observed at Downstate—requesting that his name be placed on a list to receive the Eid ul Fitr feast on January 15.

Ford was apparently not the first person to express concern over the prospect of Muslim SHU prisoners missing out on their religious meals. Just months before, Imam Warith–Deen Umar, who was then the Ministerial Program Coordinator for Islamic Affairs, issued the following memorandum to all the Muslim Chaplains within DOCS regarding SHU inmates' Ramadan meals and the special meals for the Eid ul Fitr and the Eid ul Adha (collectively, the "Id meals"):

> A major concern of Muslim prisoners in special housing units and keeplock status is their accommodations during the month of Ramadan fast. With Ramadan and the two Ids coming soon, this is a good time to remind you and advise you to include the service of confined Muslims in your ministerial plans for Ramadan and the Ids. These inmates, more than often, will participate in the fast. Arrangements should be made for them

---

4. Islam's other major religious observance, according to the DOCS religious authorities, is the Eid ul Adha.

5. According to the state-wide DOCS Ramadan menu, the Eid ul Fitr feast consisted of halal chicken, whiting, rice, sweet potatoes, tossed salad with dressing, fruit salad, banana, broccoli, bean pie and a beverage.

to receive their evening meals in time for properly breaking the fast. *They should also be able to receive the Id meals.*

(emphasis added). This memorandum was copied to all prison superintendents.

Although Muslim inmates in SHU at Downstate did receive their Ramadan meals throughout the holy month, Imam Rashada informed Ford that SHU prisoners were not allowed to receive the Eid ul Fitr feast. Ford then filed the following grievance with the prison's Inmate Grievance Review Committee: [6]

> I am a Muslim in SHU. Today Imam Rashida brought to my attention that Downstate C.F. denies Muslims on keeplock or in SHU our meals from the Eid Al Fitra and Eid Al Ahda [*sic*]. The Eid Al Fitra and Eid Al Ahda are two Islamic holidays that are constitutionally protected even in prison. Downstate C.F. is the only prison in DOCS that denies Muslims in SHU or keeplock our Eid Al Fitra and Eid Al Ahda [*sic*] meals.

After three days passed without response, Ford sent a letter—dated January 13—reiterating his grievance to defendant Downstate Superintendent John McGinnis. It was, however, not until five days after the January 15 Eid ul Fitr feast was served at Downstate that Ford received a letter from defendant Downstate Assistant Deputy Superintendent Gordon Lord stating that inmates in SHU do not receive the Eid ul Fitr feast, as that meal is offered to only those inmates permitted to attend the event. Ford was never served the Eid ul Fitr feast for that Ramadan season.

Ford began this lawsuit pro se, complaining under 42 U.S.C. § 1983 that the refusal to serve him the Eid ul Fitr feast denied him rights guaranteed under the Free Exercise Clause of the First Amendment. After surviving defendants' motion to dismiss, *see Ford v. McGinnis,* 2000 WL 1808729 (S.D.N.Y. Dec. 11, 2000), 2000 U.S. Dist. LEXIS 17910, at *14, Ford was provided counsel. Following discovery, the district court granted defendants' motion for summary judgment, accepting defendants' argument that Ford's religious beliefs were not infringed because the feast, having been moved beyond the three days following the close of Ramadan, no longer carried any objective religious significance. *See Ford,* 230 F.Supp.2d at 347–48.

The district court found it significant that although the Eid ul Fitr is governed by DOCS Directive 4202, which sets out prison officials' obligations in accommodating prisoners' religious practices, the postponed feast is held pursuant to DOCS Directive 4022, which covers so-called "Family Day Events." *Id.* at 344. The Director of Ministerial and Family Services for DOCS, John Loconte, averred that DOCS does not place any religious significance on "Family Day Events" and, moreover, none of the DOCS Muslim clerics "ever stated that any inmate's religion requires attendance at the DOCS-sponsored 'Family Day Events,'" and further that "no religious advisor to DOCS has

---

**6.** Ford's grievance was later dismissed when he was transferred out of Downstate on January 21, 2000. In February 2000, Ford sought review of the dismissal with the Central Office Review Committee for DOCS, but the Committee refused to review Ford's complaint because he had not first sought review of the dismissal of his grievance with Downstate. The district court rejected defendants' argu-

ments below that this amounted to a failure to exhaust administrative remedies prior to bringing the present lawsuit. *Ford,* 230 F.Supp.2d at 343 n. 5. This defense has not been re-argued by defendants on appeal, and any failure on Ford's part to have exhausted administrative remedies does not deprive us of jurisdiction. *See Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003).

ever suggested that the special 'Family Day Events' observing holy days have any religiously-mandated significance."

Furthermore, the district court credited the testimony of three DOCS religious authorities, one of whom stated that "[t]he religious need [for the Eid ul Fitr feast], the religious urgency of it was within the parameters of three days [following the end of Ramadan]. Beyond that, it's a family event." Another religious authority said "[o]nce you move it, it's no longer a religious day." And still another of these religious authorities clarified that participation in the Eid ul Fitr is not mandated by Muslim law or teaching: "If they don't participate in the Eid they have not committed a sin, as opposed to something that is ordered by Allah in the Koran if they don't participate in it then they have committed a sin."

Despite recognizing that "Ford sincerely believes that celebration of the Eid ul Fitr—including the Eid ul Fitr prayer and the Eid ul Fitr feast—is critical to his observance as a practicing Muslim," *id.* at 345, the district court held that defendants "did not violate Ford's First Amendment rights when they refused to provide him with the January 15 Family Day Event meal," *id.* at 347–48. The district court further held that defendants were entitled to summary judgment on two alternative grounds: (i) the denial of one Eid ul Fitr feast is a constitutionally de minimis burden on Ford's free exercise of religion, *id.* at 348 n. 10, and (ii) defendants were entitled to qualified immunity because, in light of the advice of the DOCS religious authorities, it was objectively reasonable for them to believe that their refusal to provide Ford the Eid ul Fitr feast did not violate his constitutional rights, *id.* at 348.

On appeal, Ford argues that the defendants were not entitled to a judgment as a matter of law on any of these grounds.

Foremost, Ford maintains that the district court erred as a matter of law in applying an objective test to his free exercise claim. He further contends that whether his constitutional injury is de minimis is a disputed issue of fact. Finally, as to the issue of qualified immunity, Ford argues that as a matter of law the reliance upon the advice of religious authorities is insufficient to render the defendants' conduct objectively reasonable, or, even if not, there is at the very least a factual dispute over whether or not the defendants did rely upon the advice of the DOCS religious authorities in deciding to refuse Ford the feast.

Defendants offer only a tepid defense of the district court's conclusion that there had been no violation of Ford's free exercise rights because the meal, once moved, had no objective religious significance. They instead argue that they are entitled to an affirmance on the district court's alternative holdings, emphasizing the de minimis nature of the burden on Ford's religious exercise and arguing that the defendants are entitled to qualified immunity. Defendants further argue, for the first time, that—under *Turner* and *O'Lone*—any infringement of Ford's free exercise rights was excusable as reasonably related to a legitimate penological interest.

## DISCUSSION

We review the district court's grant of summary judgment in favor of defendants *de novo* and focus on whether the district court properly concluded that there was no genuine issue as to any material fact and that defendants were entitled to judgment as a matter of law. *See Allstate Ins. Co. v. Mazzola,* 175 F.3d 255, 258 (2d Cir.1999). For these purposes, we must draw all factual inferences in Ford's favor. *See Nationwide Life Ins., Co. v. Bankers Leasing Ass'n,* 182 F.3d 157, 160–61 (2d Cir.1999).

## I. Free Exercise Claim

■ Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.1990). The free exercise claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir.1988) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)).

Whether or not brought by prisoners, free exercise claims often test the boundaries of the judiciary's competence, as courts are "singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984). As a consequence, "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.'" *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir.2002) (quoting *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)).

### A. Ford's Sincerely Held Religious Belief

In free exercise cases, scrutiny of the prisoner's sincerity is often essential in "differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Patrick*, 745 F.2d at 157. The district court, however, did not doubt Ford's sincerity, finding Ford's belief that the Eid ul Fitr feast is "critical to his observance as a practicing Muslim" to be sincere. *See Ford*, 230 F.Supp.2d at 345. Moreover, defendants have not challenged Ford's sincerity on appeal.

The district court nevertheless held that Ford's "individualized, subjective" beliefs are not entitled to First Amendment protection in light of the testimony of the DOCS religious authorities that Ford's belief did not comport with "Islam's actual requirements." *Id.* at 347. Weighing the unanimity of the DOCS religious authorities' opinion that the feast, when not held within the three days immediately following Ramadan, was "no longer of religious significance," against Ford's assertion to the contrary, the district court held that the balance tipped decidedly in favor of the defendants, and that Ford's beliefs did not warrant constitutional protection. *Id.*

In order to reach that conclusion, the district court distinguished *Jackson v. Mann*, 196 F.3d 316, 320–21 (2d Cir.1999), in which we held that a prisoner's subjective "sincerely held" belief that he is a Jew constitutionally entitles him to a kosher diet, as applicable only in cases in which the question is whether or not a person is a member of an organized religion. As the question presented in the instant case is not whether Ford is or is not a Muslim, the district court found *Jackson* inapplicable. *See Ford*, 230 F.Supp.2d at 346–48. As discussed below, we find this reading of *Jackson* untenably narrow in light of existing free exercise jurisprudence.

Ford argues on appeal that the district court impermissibly substituted an objective test for the subjective test articulated by the Supreme Court in *Frazee v. Illinois Department of Employment Security*, 489

U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989). In *Frazee*, the Supreme Court unanimously held that it was a violation of an individual's free exercise rights to deny that person benefits pursuant to an Illinois statute that rendered ineligible persons who "failed, without good cause, ... to accept suitable work when offered ...." *Id.* at 830, 109 S.Ct. 1514. There, the complainant William Frazee had failed to take a job for the sole reason that it would have required him to compromise his sincere belief that his religion forbade work on a Sunday. *Id.* at 833–34, 109 S.Ct. 1514. The Illinois state courts had rejected Frazee's claim on the ground that the prohibition against Sunday work was not found in any "tenet or dogma of an established religious sect" to which Frazee claimed membership. *Id.* at 831, 109 S.Ct. 1514.

The Supreme Court rejected the state courts' reasoning, stating that none of its prior free exercise decisions turned on a plaintiff's membership in a particular sect "or on any tenet of the sect involved." *Id.* at 832–33, 109 S.Ct. 1514. Indeed, the Court made clear that in a factually similar case, *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), "disagreement among sect members" over the issue of whether work was prohibited on the Sabbath had not prevented the Court from finding a free exercise violation based on the claimant's "unquestionably [ ] *sincere belief* that his religion prevented" him from working. *Frazee*, 489 U.S. at 833, 109 S.Ct. 1514. Having laid this groundwork, the Court quickly rejected an objective test for free exercise protection:

> [W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organiza-

tion. Here, Frazee's refusal was based on a sincerely held religious belief. Under our cases, he was entitled to invoke First Amendment protection.

*Id.* at 834, 109 S.Ct. 1514. The Court then supplied a limiting principle to guide the application of this broad subjective test, stating that "an asserted belief might be 'so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection ....'" *Id.* at 834 n. 2, 109 S.Ct. 1514 (quoting *Thomas*, 450 U.S. at 715, 101 S.Ct. 1425).

In many respects, the Supreme Court's opinion in *Frazee* mirrored this Court's approach to free exercise claims previously articulated in *Patrick v. LeFevre*, 745 F.2d 153 (2d Cir.1984). Vernon Patrick was an inmate whose request to organize a religious group was refused by prison officials who did not believe that Patrick's beliefs constituted a religion. We reversed the district court's grant of summary judgment in favor of defendants, noting that "courts have jettisoned the objective, content-based approach previously employed to define religious belief, in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Id.* at 157 (internal citations and quotations omitted). We also emphasized that "[t]he freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs." *Id.*

We also have employed a subjective test to evaluate the free exercise claims of prisoners in two more recent cases. *See Jolly v. Coughlin*, 76 F.3d 468 (2d Cir.1996); *Jackson*, 196 F.3d at 316. In *Jolly*, the plaintiff inmate claimed his Rastafarian beliefs were unconstitutionally burdened when he was forced into keeplock after refusing to subject himself to prison-man-

dated tests for latent tuberculosis ("TB").[7] The plaintiff claimed that, under the tenets of his religion, it was a sin to take artificial substances into his body. *See Jolly,* 76 F.3d at 476. The defendants argued in response that the TB test was derived from natural proteins, rather than artificial substances. *Id.* Thus, the question presented was whether the plaintiff's sincere belief that the TB test violated his religion was legally protected in light of objective, scientific evidence that the test was not artificial.

We refused to evaluate the objective reasonableness of the prisoner's belief, holding that our "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Id.* In upholding the plaintiff's claim, we made clear that to apply an objective test in such cases would require courts to resolve questions that are beyond their competence:

> [C]ourts are not permitted to ask whether a particular belief is appropriate or true—however unusual or unfamiliar the belief may be. While it is a delicate task to evaluate religious sincerity without questioning religious verity, our free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions. . . . We have no competence to examine whether plaintiff's belief has objective validity.

*Id.* (emphasis removed).

■ With this understanding of the sweep of the Constitution's free exercise guarantee, we consider *Jackson,* the case upon which the district court largely relied in disposing of the instant case. Nathaniel Jackson, a prisoner who identified himself as Jewish, requested a kosher diet. *See Jackson,* 196 F.3d at 317. The defendants denied Jackson's request after the prison rabbi advised officials that Jackson objectively was not a Jew. *Id.* at 318. The district court granted summary judgment to defendants, *id.* at 319, but we reversed, holding that "the question whether Jackson's beliefs are entitled to Free Exercise protection turns on whether they are 'sincerely held,' not on the 'ecclesiastical question' whether he is in fact a Jew under Judaic law." *Id.* at 321 (citations and quotations omitted in original). We made no suggestion in *Jackson*—nor could we have in light of preceding cases—that the First Amendment protects only a prisoner's sincerely held religious "belief that he is a member of an established religion." *Ford,* 230 F.Supp.2d at 347.

The district court thus erred in reading *Jackson* in so limited a fashion. Nothing in *Jackson,* or the cases on which its holding relied, permitted the district court to assess the objective validity of Ford's belief that the Eid ul Fitr feast carried religious significance even when postponed. By looking behind Ford's sincerely held belief, the district court impermissibly confronted what is, in essence, the "ecclesiastical question" of whether, under Islam, the postponed meal retained religious meaning. *Cf. Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, *or the validity of particular litigants' interpretations of those creeds.*") (emphasis added).

The opinions of the DOCS religious authorities cannot trump the plaintiff's sincere and religious belief.[8] For purposes of

---

**7.** Jolly's claims were brought under the then-existing Religious Freedom Restoration Act rather than the First Amendment. *See discussion, infra Part I.B.*

**8.** That the district court's inquiry was mis-

summary judgment, we must accept the district court's finding that Ford "sincerely believes that celebration of the Eid ul Fitr—including the Eid ul Fitr prayer and the Eid ul Fitr feast—is critical to his observance as a practicing Muslim," *Ford*, 230 F.Supp.2d at 345, and hold that any perceived lack of objective validity to Ford's belief did not entitle defendants to judgment as a matter of law.

## B. Substantial Burden

Defendants next argue that, even if his belief was sincerely held and religious, Ford's claim still fails since the denial of this one meal is not a "substantial burden"—or, in other words, is a "de minimis burden"—on his religious exercise. Again relying on the apparent lack of objective validity to Ford's belief, the district court held that the absence of a substantial burden provided an alternative basis for granting defendants judgment as a matter of law. *Id.* at 348 n. 10.

█ The notion that a plaintiff must establish a substantial burden on his religious exercise to claim constitutional protection is derived from the Supreme Court's test in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963),

which did not involve a prisoner, but rather a petitioner claiming a religious exemption to unemployment benefits statutes. The *Sherbert* Court held that government actions that substantially burden a religious practice must be justified by a compelling governmental interest. *Id.* at 402–403, 83 S.Ct. 1790. This formulation of the free exercise test has persisted, at least in some contexts, for years. *See, e.g., Thomas*, 450 U.S. at 707, 101 S.Ct. 1425; *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384–85, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990); *Altman v. Bedford Cent. School Dist.*, 245 F.3d 49, 79 (2d Cir.2001). When the Supreme Court subsequently made clear that the government interest needed to overcome a burden on prisoners' religious exercise is much lower than that required in other cases, *see O'Lone*, 482 U.S. at 342, 107 S.Ct. 2400 (holding burden on prisoners' free exercise rights justified if reasonably related to legitimate penological interest), however, no mention was made of a prisoner's obligation to demonstrate that the burden on his or her religious exercise is substantial.[9]

---

guided is further evidenced by its concern that to rely on a purely subjective test would require prisons to accommodate idiosyncrasies such as an inmate's request to drink actual blood while receiving Holy Communion. *Ford*, 230 F.Supp.2d at 347. Responding to this hypothetical worst case scenario, the district court stated "[o]f course, [the inmate] would be wrong as the 'blood' received in that sacrament is symbolized with wine." *Id.* District courts have no aptitude to pass upon the question of whether particular religious beliefs are wrong or right. Denying a prisoner blood is likely constitutional for other reasons, but it is impermissible for a district court to determine that the Constitution is not implicated because the court deems a prisoner's sincere belief objectively incorrect according to the tenets of his religion.

9. It may be, however, that the alleged burden on the prisoners' free exercise rights in *O'Lone* was indisputably substantial, or that resolving whether the burden was substantial was unnecessary since any burden was reasonably related to the proffered penological interests. *See O'Lone*, 482 U.S. at 351–52, 107 S.Ct. 2400 ("While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological interests to that end."); *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C.Cir.2002) (suggesting Supreme Court in *O'Lone* assumed that the religious services were important to the prisoners). Subsequent to *O'Lone*, however, we articulated the free exercise test applicable to prisoners without mention of a substantial

Then in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held the *Sherbert* test inapplicable to cases in which the alleged infringement on an individual's free exercise rights derives from the enforcement of a facially neutral law. *Id.* at 884–85, 110 S.Ct. 1595. In so doing, the *Smith* majority made clear that it not only regarded the *Sherbert* test as inapplicable to challenges of facially neutral laws that incidentally burden religion, but also that it took issue with the premise that courts can differentiate between substantial and insubstantial burdens. *Id.* at 887, 887 n. 4., 110 S.Ct. 1595

In a now familiar saga, the details of which need not be recounted here, Congress responded to *Smith* by statutorily mandating application of the *Sherbert* test to all free exercise claims across the board, only to have the Supreme Court invalidate the statute as an attempt by Congress to legislate in excess of its constitutional powers. *See City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (invalidating the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.* ("RFRA")). While it was still good law, we dutifully applied RFRA's substantial burden test to prison-

ers' free exercise claims, *see, e.g., Jolly,* 76 F.3d at 474–80, despite the Supreme Court's suggestion in *Smith* that so doing puts courts in "the unacceptable business of evaluating the relative merits of differing religious claims." *Smith,* 494 U.S. at 887, 110 S.Ct. 1595 (citation and internal quotation marks omitted).

Now with RFRA invalidated,[10] however, the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. *Compare Williams v. Morton,* 343 F.3d 212, 217 (3d Cir.2003) (finding "no support for" defendants' argument that it is "a prerequisite for the inmate to establish that the challenged prison policy 'substantially burdens' his or her religious beliefs"), *with Levitan v. Ashcroft,* 281 F.3d 1313, 1320–21 (D.C.Cir.2002) (requiring prisoners demonstrate that free exercise of religion substantially burdened).

In this case, Ford has not argued that the substantial burden test no longer persists as a threshold requirement to his free exercise claim. Given that fact, and because we did not benefit from the parties' briefing on the issue, we therefore proceed in this appeal on the assumption that the substantial burden test applies.[11]

---

burden requirement. *See Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) ("To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.").

**10.** We note that insofar as detention facilities are recipients of federal funds, the *Sherbert* test may still apply to the free exercise claims of many prisoners under the Religious Land Use and Institutionalized Persons Act of 2000,

114 Stat. 803, 42 U.S.C. § 2000cc *et seq.* Presumably because this statute became effective after the events that gave rise to this litigation, Ford has asserted no claim under this statute.

**11.** At oral argument, defendants' counsel suggested that this Court has recently reaffirmed the existence of a substantial burden requirement in prisoners' free exercise claims. The decision defendants' counsel cited for that proposition, which is also cited in defendants' brief, is an unpublished summary order. As such, it is not binding authority in this Circuit and should not have been cited or argued to this Court. *See* 2d Cir. R. § 0.23.

Applying the substantial burden test requires courts to distinguish important from unimportant religious beliefs, a task for which we have already explained courts are particularly ill-suited. Always present is the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent rather than confront the often more difficult inquiries into sincerity, religiosity and the sufficiency of the penological interest asserted to justify the burden. The substantial burden test, however, presupposes that there will be cases in which it comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis.

■ The district court found that Ford had not established a substantial burden because "given that the Muslim clerics testified that participation in the Eid ul Fitr is not religiously required and that the meal loses all religious significance when moved, deprivation of a post-Eid meal can be seen as a de minimis burden on Ford's religious freedom." *Ford,* 230 F.Supp.2d at 348 n. 10. The court accordingly held that the absence of a substantial burden was an alternative ground entitling defendants to summary judgment.

Insofar as the district court implied that in order for a burden to be substantial the burdened practice must be mandated by an adherent's religion, we disagree. Whether a particular practice is religiously mandated is surely relevant to resolving whether a particular burden is substantial. *See Thomas,* 450 U.S. at 717–18, 101 S.Ct. 1425 (finding substantial burden on unemployment benefits claimant's religious exercise when state "denies such a benefit because of conduct mandated by religious belief"). Neither the Supreme Court nor we, however, have ever held that a burdened practice must be mandated in order

to sustain a prisoner's free exercise claim. Nor do we believe that substantial burden can or should be so narrowly defined.

To confine the protection of the First Amendment to only those religious practices that are mandatory would necessarily lead us down the unnavigable road of attempting to resolve intra-faith disputes over religious law and doctrine. *See id.* at 716, 101 S.Ct. 1425 ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or [another adherent] more correctly perceived the commands of their common faith," because "[c]ourts are not arbiters of scriptural interpretation."); *see also Mack v. O'Leary,* 80 F.3d 1175, 1179–80 (7th Cir.1996), *vacated by* 522 U.S. 801, 118 S.Ct. 36, 139 L.Ed.2d 5 (1997) (remanding in light of *City of Boerne* ). It would furthermore except from constitutional protection many religions or sects that do not oblige adherents to engage in certain practices or maintain certain beliefs by commandments, edicts or threat of condemnation or godly retribution. *See Levitan,* 281 F.3d at 1320 ("Under the [d]istrict [c]ourt's formulation, religions that lack the concepts of commandments necessary for the salvation of the soul would find themselves outside the scope of the First Amendment protection altogether. Nothing in the [F]ree [E]xercise [C]lause suggests that it only protects religions that incorporate mandatory tests."). We therefore decline to adopt a definition of substantial burden that would require claimants to show that they either have been prevented from doing something their religion says they must, or compelled to do something their religion forbids.

■ The relevant question in determining whether Ford's religious beliefs were substantially burdened is whether participation in the Eid ul Fitr feast, in particular, is considered central or important to

Ford's practice of Islam. Defendants were not entitled to a judgment as a matter of law on this question, as the testimony of the DOCS religious authorities that, under Muslim law the feast is not religious once postponed, is not determinative of this issue. The district court credited Ford's claim that he sincerely believed that the Eid ul Fitr feast is "critical to his observance as a practicing Muslim." *Ford*, 230 F.Supp.2d at 345. The DOCS religious calendar recognizes the Eid ul Fitr as one of the faith's important celebrations and makes specific reference to the feast. At least some of the DOCS religious authorities, too, testified that the Eid ul Fitr is a holiday of great religious significance of which the feast, apart from the sweet breakfast and prayers, is an integral part.[12] Regardless of some religious authorities' interpretation of Muslim law on the issue, we do not believe that the mere postponement of the feast renders Ford's insistence that the feast is critical to his religious beliefs "so bizarre ... as not to be entitled to protection under the Free Exercise Clause." *Thomas*, 450 U.S. at 715, 101 S.Ct. 1425.

We would be inclined to hold on the basis of the record before us that Ford has established a substantial burden as a matter of law, were it not for the fact that there is apparently a factual dispute as to whether Ford was served a substitute Eid ul Fitr feast on January 7. *See Ford*, 230 F.Supp.2d at 342. The scant evidence supporting this assertion suggests that it is unlikely Ford was served something approximating the Eid ul Fitr feast on that day. The absence of a cross-motion for summary judgment by plaintiff and the semblance of a disputed factual issue, however, prevents us from holding that plaintiff is entitled to summary judgment on this issue.

## C. Reasonably Related to Legitimate Penological Interests

Even if defendants abridged Ford's free exercise rights by refusing him the Eid ul Fitr, their conduct was constitutional if reasonably related to some legitimate penological interests.[13] *See Overton v. Bazzetta*, 539 U.S. 126, ——–——, 123 S.Ct. 2162, 2167–68, 156 L.Ed.2d 162 (June 16, 2003); *O'Lone*, 482 U.S. at 342, 107 S.Ct. 2400; *Turner*, 482 U.S. at 78, 107 S.Ct. 2254. In their motion for summary judg-

12. The Eid ul Fitr feast is sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden. *See Rapier v. Harris*, 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (holding unavailability of pork-free meals on three out of 810 occasions constitutes only de minimis burden on prisoner's religion).

13. At oral argument, defendants suggested for the first time that rather than the framework set out in *Turner* and *O'Lone*, this case should be analyzed under *Smith*, in which the Supreme Court held that a burden on a person's religious belief does not exempt that person from complying with otherwise valid, neutral laws of general applicability. Defendants argue in essence that Ford was refused the meal pursuant to a general policy of declining such meals to SHU prisoners. The Circuits are split over whether *Smith* has any application to prison regulations and, if so, in what circumstances. *See Levitan*, 281 F.3d 1313 at 1319 (summarizing cases but ultimately declining to apply *Smith* to the case before the court). Even assuming that we would find *Smith* applicable in the prison setting, this case seemingly does not involve a neutral law of general applicability as conceived of in *Smith*. We, however, express no opinion on the question as we decline to address issues raised for the first time on appeal. *See Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

ment below, defendants did not argue that legitimate penological interests justified their conduct, and the district court therefore never reached the issue. Defendants argue on appeal, however, that this is an alternative ground on which we should affirm the grant of summary judgment in their favor.[14]

In *Turner,* the Supreme Court made clear that the standard of review for prisoners' constitutional claims is necessarily more deferential in light of the "intractable problems" of prison administration: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. Even assuming Ford can show that his free exercise rights have been burdened, therefore, the refusal to provide him with the Eid ul Fitr feast is excusable if the decision was supported by legitimate penological interests.[15]

■ Determining whether a particular regulation meets the *Turner* standard, according to the Supreme Court, may involve the weighing of the following factors. First, there must be a valid and rational connection between the regulation and the legitimate government interest justifying it. Second, the claimed infringement is to be evaluated in light of the prisoners' other available means of exercising the right. Third, the consequences of requiring accommodation of the right on prison staff,

other prisoners and the allocation of prison resources generally should be considered. Finally, the court should consider whether available, low-cost alternatives exist that would accommodate the right without compromising valid penological interests. *Id.* at 89–91, 107 S.Ct. 2254. Applying this test, the *Turner* Court upheld a regulation governing inmate correspondence and struck a regulation restricting inmates' abilities to marry. *Id.* at 93, 97, 107 S.Ct. 2254.

The Supreme Court applied the *Turner* standard to a prisoner's free exercise claim in *O'Lone,* upholding a prison regulation that prevented Muslim prisoners from attending what were claimed to be mandatory religious services. *O'Lone,* 482 U.S. at 350–53, 107 S.Ct. 2400. The Court found that being prevented from attending the services was constitutional in light of the fact that the Muslim prisoners "are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations." *Id.* at 352, 107 S.Ct. 2400.

■ Recognizing that the Supreme Court in *Turner* and *O'Lone* intended to accord prison officials a high level of deference, we thereafter made clear that once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to "show that these [penological] concerns were irrational." *Fromer v. Scully,* 874

---

**14.** Ford argues that because the defendants did not put forward any legitimate penological interests in their motion for summary judgment that they waived any defense premised on *Turner* and *O'Lone.* We, however, cannot agree as defendants were not required to raise every potential legal argument in their motion for summary judgment.

**15.** Although *Turner* and *O'Lone* concerned the reasonableness of prison regulations, we have

previously suggested that the analysis is the same as to an individual decision to deny a prisoner the ability to engage in some requested religious practice. *See Young v. Coughlin,* 866 F.2d 567 (2d Cir.1989). Regardless of whether the Eid ul Fitr feast was denied pursuant to an individual decision or a policy of not providing prisoners such meals, we therefore believe the inquiry would be the same.

F.2d 69, 74 (2d Cir.1989) (upholding prison regulation requiring prisoners' beards be no longer than one inch); *see also Overton,* 539 U.S. at ——, 123 S.Ct. at 2168 ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.").

Relying on *Turner* and *O'Lone,* defendants argue that, despite the subjective religious beliefs some prisoners place on events such as the Eid ul Fitr feast, these events are chiefly held for the legitimate penological and rehabilitative purposes of bringing inmates together with their families. Since SHU inmates cannot attend the events, defendants argue that this purpose would not be furthered by providing keeplock prisoners the feast, and that they therefore had the discretion to deny Ford's request. Defendants also emphasize the administrative burdens that such events impose upon prison staff and argue that they have an interest in not taking on the additional burden of accommodating the special requests of SHU-housed prisoners. These penological interests, according to defendants, are sufficient to justify any infringement upon Ford's religious exercise, especially in light of the many other opportunities Muslim prisoners are given to practice their faith.

Ford, however, counters that prison officials have no legitimate penological interest in refusing to accommodate his religious exercise merely because accommodating his right would not further the completely unrelated purpose of bringing prisoners together with their families. Furthermore, Ford stresses that prison officials could have provided him the meal at almost no extra cost and without imposing any meaningful administrative burdens. Ford argues that the defendants' claims to the contrary are belied by the fact that in addition to accommodating the many religious, dietary re-

quests of prisoners on a daily basis, prison officials in other facilities have consistently served the Eid ul Fitr feast to SHU-housed prisoners. Indeed, even in SHU at Downstate—where Ford was incarcerated at all times relevant to this litigation—the Eid ul Fitr feast apparently has been served to prisoners in recent years.

None of these arguments, however, were made to the district court, as defendants did not move for summary judgment on these grounds. Consequently, the record is insufficient to resolve this fact—and context—specific dispute. We therefore cannot accept defendants' invitation to weigh the *Turner* factors for the first time on appeal. In order to facilitate the necessary findings of fact and to give Ford an adequate opportunity to prove that the proffered interests lack a rational relationship to the defendants' conduct, the proper course is to remand. If the defendants renew their motion for summary judgment, the district court will be able to assess the facts in light of the *Turner* balancing test in the first instance.

## II.   Qualified Immunity

As with public officers generally, prison officials performing tasks entrusted to their discretion typically "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Hanrahan v. Doling,* 331 F.3d 93 (2d Cir.2003). In ascertaining whether the defendants are entitled to qualified immunity, we must look "to both 'the clarity of the law establishing the right allegedly violated' as well as 'whether a reasonable person, acting under the circumstances the confronting a defendant,

would have understood' that his actions were unlawful." *Hanrahan*, F.3d at 98 (2d Cir.2003) (quoting *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir.2001)).

Balanced against the desire "to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury" is the need "to hold responsible public officials exercising their power in a wholly unjustified manner." *Duamutef v. Hollins*, 297 F.3d 108, 111 (2d Cir. 2002). Summary judgment for defendants on grounds of qualified immunity is therefore appropriate "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir.1996) (quoting *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir.1996)).

▪ We agree with the district court's discussion of qualified immunity insofar as it found that the constitutional right at issue is clearly established. *Ford*, 230 F.Supp.2d at 348. Defendants argue that the specific right at issue has not been clearly established, as this Court has never held that "prison officials were obligated to provide an inmate with an Eid–ul–Fitr meal." We, however, have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples, *see Kahane v. Carlson*, 527 F.2d 492 (2d Cir.1975); *see also Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir.1992) ("The principle [*Kahane*] established was not placed in any reasonable doubt by intervening Supreme Court rulings[.]"), and we also have found it well established that a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock, *see Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir.1993). Defendants are correct that we have never had occasion to recognize a prisoner's right to the Eid ul Fitr feast in particular, but courts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the right to be clearly established. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). We find that prior cases make it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying Ford a feast imbued with religious import was unlawful.[16]

▪ We part company with the district court, however, over the reasonableness of defendants' belief that they did not violate Ford's constitutional rights. The district court held that it was "objectively reasonable for defendants to rely on" the advice of the DOCS religious authorities to conclude that the postponed Eid ul Fitr feast did not retain religious significance. *Ford*, 230 F.Supp.2d at 348. Whether the prison officials, with or without the counsel of the religious authorities, thought that the Eid ul Fitr feast was not religious is beside the

---

**16.** Defendants contend that it is not well established that prison officials must provide prisoners with a meal that prison officials reasonably believe is not religious. While the reasonableness of the defendants' conduct is relevant to the second step of the qualified immunity analysis, defendants' beliefs as to the religious content of the Eid ul Fitr feast are irrelevant to whether the claimed right is clearly established.

point.[17] Despite the fact that all the religious authorities testified to their belief that the postponed Eid ul Fitr was without religious significance, the proper inquiry was always whether Ford's belief was sincerely held and *"in his own scheme of things,* religious." *Patrick,* 745 F.2d at 157 (quoting *Seeger,* 380 U.S. at 185, 85 S.Ct. 850 (emphasis added)). We do not suggest that religious authorities can never be employed in assisting prison officials in making that determination, but the religious authorities' opinions that a particular practice is not religiously mandated under Muslim law, without more, cannot render defendants' conduct reasonable. *See Jackson,* 196 F.3d at 321 (denying qualified immunity to prison officials who refused prisoner a kosher diet in reliance upon prison rabbi's advice that prisoner was not a Jew under Jewish law).

Finally, inasmuch as defendants premise their qualified immunity defense on their reasonable belief that their conduct was justified by a legitimate penological interest, *see Shabazz v. Coughlin,* 852 F.2d 697, 700 (2d Cir.1988), we find it premature to address the issue. As discussed *supra,* the district court never tested the relationship between the decision to refuse Ford the feast and any legitimate penological justifications. Only if on remand the district court finds that Ford's constitutional rights were violated in light of the *Turner/O'Lone* factors, should it then entertain defendants' arguments that they are nevertheless entitled to qualified immunity. *See Stuto v. Fleishman,* 164 F.3d 820, 825 (2d Cir.1999) (holding courts should first determine whether a constitutional violation occurred before deciding whether qualified immunity exists).

## CONCLUSION

Always careful to resolve only the questions as they are presented to us, we hold only that defendants were not entitled to summary judgment on the grounds relied upon by the district court. On remand, the district court should embark on the *Turner/O'Lone* inquiry if a renewed motion for summary judgment is made by defendants and after the parties have had sufficient opportunity to complete discovery on this issue. Consideration of the *Turner* factors set out above should provide the district court with a basis to determine whether the refusal to provide Ford the Eid ul Fitr was sufficiently justified by legitimate penological interests. Only if the *Turner/O'Lone* balance tips in Ford's favor should the district court then consider whether the defendants nevertheless could have reasonably believed that their conduct was justified by a legitimate penological interest, and thus are entitled to qualified immunity.

For the reasons stated above, we Vacate the district court's grant of summary judgment to defendants and Remand for further proceedings consistent with this decision.

---

**17.** Ford argues on appeal that whether the defendants actually relied upon the advice of the religious authorities before refusing him his meal is a disputed issue of fact. Because we hold as a matter of law that the prison officials' conduct was not objectively reasonable, even if done in reliance upon the opinion of the religious authorities that Ford's belief lacked objective religious significance, we need not address this argument.